350

HARRY LEE SMITH AND PATRICIA ANN SMITH, PETITIONERS
*v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

HERBERT J. JACOBSON AND RUTH D. JACOBSON, PETITIONERS
*v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 12709–77, 185–78.    Filed March 5, 1982.

*David H. Singer*, for the petitioners.*
*Theodore J. Kletnick, Vincent R. Barrella*, and *Cynthia J. Mattson*, for the respondent.

NIMS, *Judge*: In these consolidated cases, respondent determined the following deficiencies in petitioners' Federal income taxes for the taxable year 1973:

| Docket No. | Petitioner | Deficiency |
|---|---|---|
| 12709–77 | Harry Lee Smith and Patricia Ann Smith | $27,541 |
| 185–78 | Herbert J. Jacobson and Ruth D. Jacobson | 30,196 |

Concessions having been made by petitioners in docket No. 12709–77, the sole issue remaining for decision is the deductibility of certain losses claimed by petitioners to have resulted from engaging in what is commonly referred to as a "commodity tax straddle."

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioners Harry Lee Smith (Smith) and Patricia Ann Smith, husband and wife, resided in La Jolla, Calif., at the time the petition in docket No. 12709–77 was filed.

Petitioners Herbert J. Jacobson (Jacobson) and Ruth D. Jacobson, husband and wife, resided in San Diego, Calif., at the time the petition in docket No. 185–78 was filed.

The Smiths and the Jacobsons each filed joint Federal

---

*Brief amicus curiae was filed by Matthew J. Zinn, Charles G. Cole, and Suzanne R. McDowell as attorneys for Futures Industry Association, Inc.

income tax returns for the 1973 taxable year using the cash receipts and cash disbursements method of accounting.

During the early 1970's, Smith and Jacobson were both successful real estate developers. In 1971, the two men formed a partnership to develop apartments at La Costa, Calif., with a view to resale. On October 17, 1972, Smith and Jacobson sold their partnership interests to third parties at a substantial gain. The proceeds of these sales were to be received in the years 1972 through 1974, inclusive, with profits from the sale to be recognized for tax purposes on the installment sales method. Pursuant to the sales, the Smiths reported a $69,745 short-term capital gain in 1973; the Jacobsons reported a $68,802 short-term capital gain in such year.

Myron Shelley (Shelley) was a stockbroker working at the San Diego offices of Merrill Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch), in 1973. Sometime after 1966, he had attended a seminar given by Thomas O'Hare (O'Hare), who headed Merrill Lynch's "Tax Straddle Department." O'Hare's presentation at Shelley's seminar was, in summary, as follows.

First, O'Hare explained that commodity tax straddles were useful for high-bracket taxpayers with large short-term capital gains. (O'Hare recommended a minimum of $20,000 in short-term capital gain and a 50-percent tax bracket before putting a client into a straddle.)

Second, O'Hare explained the mechanics of a typical tax straddle.

Third, O'Hare noted the beneficial tax results that a straddle was supposed to produce: (1) Deferring short-term capital gain from the current taxable year to the succeeding taxable year; and (2) depending on whether the price of the underlying commodity moved generally up or down over the course of the straddle, possibly converting the short-term capital gain in the second taxable year into long-term capital gain.

Commission costs were likely to amount to 10 percent of the short-term capital gain offset by the straddle, O'Hare explained. Customers should also be prepared for "difference" or "spread" losses of an equal amount.

Finally, O'Hare urged his audience to solicit business for the tax straddle department, located in New York. Stockbrokers would be paid in commissions for finding appropriate business.

Shelley first met Jacobson through mutual friends. At a luncheon meeting between the two men in 1973, Shelley learned that Jacobson had a large short-term capital gain that year. Shelley explained to Jacobson that there was a possibility the latter could enter into a series of commodity transactions that might result in deferral of his gain and possibly convert it to a long-term capital gain. Jacobson showed interest in Shelley's ideas and Shelley then set up a meeting with Clifford Schmidt (Schmidt), a commodities trader in the San Diego Merrill Lynch office.

The meeting with Schmidt was held on or about June 7, 1973, in the offices of Henry Sussman (Sussman), Jacobson's accountant. Attending the meeting were Schmidt, Shelley, Jacobson, Sussman, and Mrs. Jacobson. At this meeting, Schmidt explained basically how a tax straddle worked and detailed the potential market risks of straddling. Jacobson was primarily concerned with how much he would be at economic risk of losing in a tax straddle. Not counting commissions, Schmidt quoted Jacobson a figure of approximately 25 percent of margin. Jacobson then inquired whether that meant he could also make a gain of 25 percent of margin. Schmidt said, "yes." Schmidt also briefly discussed commission costs, giving the impression that they would be in the range of $4,000. Schmidt told Jacobson that O'Hare's tax straddle department in New York was expert in this area. Jacobson agreed to go ahead with the straddle, but asked that O'Hare's department, not Schmidt, handle the transactions.

Jacobson later told Smith about the commodity straddle he was planning, and Smith became interested in straddling to reduce his large short-term capital gain, also. Smith contacted Schmidt by phone. After a brief conversation wherein Schmidt gave a quick summary of what he had told Jacobson at the June 7 meeting, Smith requested that he, too, be put into a commodity tax straddle.

Notes made by George Peterson, Smith's accountant, of a telephone conversation he had with Smith on June 26, 1973, indicate that as of that date, Smith anticipated his 1973 short-term capital gain to amount to $84,752. Smith also told the accountant that he intended to "straddle" to convert that amount of short-term capital gain to long-term capital gain and to move the gain into 1974.

Schmidt next contacted O'Hare's tax straddle department in New York. O'Hare's department wanted to know what the size of the tax problem was. Schmidt replied that it was $85,000 of short-term capital gain, each, for both Smith and Jacobson.

Schmidt filled out forms entitled "New Account Information for Commodity Speculative Accounts" for Mr. and Mrs. Jacobson and for Smith. On a long blank line near the bottom of the Jacobsons' form, Schmidt wrote, "This will be an 85K tax straddle thru N.Y." Smith's form contained a similar notation.

A futures contract is a firm commitment to deliver or to receive a specified quantity and grade of a commodity during a designated month in the future (the delivery month).[1] Using the instant case as an example, a September 1974 silver futures contract traded over the Commodity Exchange, Inc. (COMEX), represents an obligation to deliver or receive 10,000 troy ounces of silver of a certain purity in the month of September 1974.

A person selling silver futures contracts is obligated to deliver the silver in the delivery month; this is known as taking a short position in silver futures. A person buying silver futures contracts is obligated to accept delivery of the silver in the delivery month; this is known as taking a long position.

The obligation to make or accept delivery of the underlying commodity may be, and often is, avoided by the futures trader by simply purchasing or selling an offsetting futures contract for the same delivery month prior to the time of actual delivery. For example, a person who has taken a short position in September 1974 silver futures (sold silver) need not deliver silver in the delivery month if prior to the time of delivery he acquires an equally offsetting long position in September 1974 silver futures (bought silver). According to the rules of the COMEX, such offsetting purchases and sales cancel each other out; at the time the offsetting purchase or sale is made, the account is closed and a "round turn" commission charge is made.

Trading in a particular month's silver futures (e.g., Septem-

---

[1] For purposes of this case, findings of fact relating to futures trading, rules of the Commodity Exchange, Inc., etc., although for convenience stated in the present tense, relate generally to years preceding 1975, unless otherwise expressly stated.

ber 1974) is conducted on the floor of the COMEX between buyers and sellers at prices that typically vary considerably during the day. In 1973, silver futures had a reputation for particularly volatile daily trading ranges.

A straddle[2] is defined as the simultaneous holding in a long position in one delivery month (e.g., March 1974) and a short position in another delivery month (e.g., July 1974). The long position and the short position are commonly referred to as the "legs" of the straddle. A straddle may be achieved in one of two ways: (1) By trading each leg separately (e.g., taking a long position in March 1974 silver and a short position in July 1974 silver in separate transactions), or (2) by taking both positions in one simultaneous transaction.

Under the COMEX rules in effect in 1973, straddles could be bought and sold as a unit. One is said to sell a straddle when the short leg of the straddle is in the farther out delivery month. For example, to achieve a straddle that is long January 1974 silver and short March 1974 silver, one would be selling the straddle. (This is because, usually, as a result of interest and so-called "carrying charges" of storage, the price of March 1974 silver will exceed the price of January 1974 silver. Thus, the straddle trader will receive more for selling March 1974 silver than he will pay out for January 1974 silver.) One is said to buy a straddle when the long leg of the straddle is in the farther out delivery month.

Outright long or short positions in commodity futures are much more risky than straddle positions. The risk in an outright position is that the price of the underlying commodity will rise or fall. In a straddle position, the risk (i.e., potential for profit or loss) is that the spread or difference between the prices of the two legs of the straddle will widen or narrow; the general trend of the price of the underlying commodity is of no serious economic (i.e., nontax) importance. Factors influencing spread movements include changes in interest rates and changes in the quantity of deliverable supplies of the underlying commodity for a particular delivery month.

---

[2]As used in this opinion, the term "straddle" refers to a commodity straddle and is to be distinguished from the type of straddle referred to in former sec. 1234(c), which section was not reenacted for options granted after Sept. 1, 1976. Sec. 2136, Tax Reform Act of 1976, 90 Stat. 1929. Sec. 1234, since it applied to options, as opposed to commodity futures, has no applicability to this case.

In the silver market, price fluctuations of the underlying commodity typically far exceed any fluctuations in the spreads between the delivery months. Margin requirements reflect this difference in risk. Margin is the amount of money or collateral deposited by a client with his broker for the purpose of insuring the broker against loss on open futures contracts. The margin is not a part payment on a purchase and does not represent a loan, as with securities. Original or initial margin is the total amount of margin per contract required by the broker and exchange when a futures position is opened. The minimum initial margin required by the COMEX on August 7, 1973, for each straddle in silver was $250; the minimum initial margin required for an outright long or short position was $2,000.

Maintenance margin is additional margin which must be deposited with the broker. If a customer's "equity" in any futures position drops to, or under, 75 percent of the original margin, the broker must issue a margin call to restore the equity. Equity is the residual dollar value of a customer's total futures trading account, assuming it was liquidated at current market prices.

Commodity customer trading accounts are "marked for market" daily to compute their equity. In marking each account for market, settlement prices are used to value each contract. Settlement prices are prices assigned daily by the floor committee of the COMEX at the end of the regular trading session. Settlement prices reflect the predominant prices at which the various delivery months' contracts were traded during the last minute of trading in the regular trading session; they are analogous to closing prices on the stock exchange.

A "butterfly straddle" is a straddle consisting of at least four legs. It is essentially a combination of two straddles that, when drawn schematically, looks to some like a butterfly. For example, the following would be a butterfly straddle:

Long March 1974      Long December 1974
Short July 1974
Short July 1974

In a butterfly straddle, each straddle must be traded separately and will usually have two different spread price differen-

tials. A butterfly straddle typically presents less risk of either adverse or favorable spread movement, and, hence, is less likely to produce a difference loss or gain than an ordinary straddle. A butterfly straddle containing delivery months encompassing only a brief period (e.g., a May 1974/July 1974/September 1974 straddle) typically presents less risk of loss or gain than a butterfly straddle spread over a longer period of delivery months (e.g., a March 1974/July 1974/December 1974 straddle).

On the COMEX, silver futures contracts, both outright long and short positions and straddles, are traded during the regular trading hours of 10 a.m. to 2:15 p.m. Pursuant to COMEX rules in 1973, straddles, only, were also allowed to be traded in an after-hours trading session.

Where a straddle is established by trading each leg separately, the price for each delivery month is determined by the trade price for each leg. Where a straddle is established in one simultaneous transaction, it is bought or sold at a price representing the difference in the prices (the spread) between the delivery months of the legs of the straddle. Pursuant to the rules of the COMEX, prices must be affixed to the underlying legs of the straddle after any simultaneous straddle trade. In 1973, these prices could be set at the discretion of the buyer and seller, subject to the following relevant limitations: (1) The prices affixed to the underlying legs had to reflect the exact differential at which the straddle was traded, and (2) the prices of the underlying legs had to be chosen from prices at which the separate delivery months' contracts actually traded as outright long or short positions during the current regular trading day.

After having received a request from Schmidt to place Smith and the Jacobsons into commodity straddles, O'Hare (or some other member of the tax straddle department in New York) filled out "holding pages" for the two new accounts. Near the top of each of these pages was the printed word "Objective" followed by a blank line. The blank line was then filled in with the notation "85M" for each account. This meant that the objective was to take a loss of $85,000 in each account before December 31, 1973.

By check dated August 3, 1973, Smith made a margin deposit of $12,000 with Merrill Lynch. The margin deposit was

credited to Smith's account on August 6, 1973. By check dated August 8, 1973, Jacobson made a margin deposit of $12,000. The margin deposit was credited to the Jacobsons' account on August 8, 1973. The Jacobsons' margin deposit occurred 1 day after the initial straddle trades were executed for both accounts. The amount of margin deposited in each account was sufficient to meet the COMEX's initial margin requirements for the placing of 42 straddles (42 × $250 = $10,500) and, in addition, to pay for one "round turn" commission charge for closing 42 long or short positions ($1,344).

On August 7, 1973, the high, low, and settlement prices for the March 1974, July 1974, and December 1974 delivery-month contracts in silver were as follows:

| Delivery month | Price in cents per ounce | | |
| | High | Low | Settlement |
|---|---|---|---|
| March 1974 | 302.30 | 290 | 291.20 |
| July 1974 | 307.70 | 297 | 297.90 |
| December 1974 | 314.20 | 306 | 306.10 |

After the close of the regular COMEX trading session on this date, O'Hare placed both Smith and the Jacobsons into the following identical straddles.

O'Hare sold 21 March 1974/July 1974 straddles at a spread differential of 6.60 cents per ounce of silver and bought 21 July 1974/December 1974 straddles at a differential of 8.30 cents per ounce. Thus, after this transaction, both Smith's and the Jacobsons' were long 21 March 1974 contracts, short 42 July 1974 contracts, and long 21 December 1974 contracts, each. These were butterfly straddles.

The purchasers of these March 1974/July 1974 straddles and the sellers of these July 1974/December 1974 straddles were other Merrill Lynch tax straddle department customers assuming mirror-image butterfly straddles to those taken by Smith and the Jacobsons. In fact, in all, O'Hare cross-traded between his customers 201 March 1974/July 1974/December 1974 butterfly straddles that day.

The prices affixed by O'Hare to the legs of Smith's and the Jacobsons' straddles were as follows:

| Straddle | Leg | Price in cents per ounce |
|---|---|---|
| March 1974/July 1974 | (Long) March 1974 | 301.10 |
| | (Short) July 1974 | 307.70 |
| July 1974/December 1974 | (Short) July 1974 | 305.90 |
| | (Long) December 1974 | 314.20 |

With respect to the March 1974/July 1974 straddle, the price assigned to the July 1974 contract was the highest price of the day, while the March 1974 contract was assigned the highest possible price, given the spread differential. With respect to the July 1974/December 1974 straddle, the price assigned to the December 1974 contract was the highest price of the day, while the price assigned to the July 1974 contract was at the highest possible price, given the spread differential. These prices were affixed in accordance with COMEX rules.

On August 9, 1973, the high, low, and settlement prices for the March 1974, May 1974, September 1974, and December 1974 delivery-month contracts in silver were as follows:

| Delivery month | Price in cents per ounce | | |
|---|---|---|---|
| | High | Low | Settlement |
| March 1974 | 291.00 | 277.60 | 290.30 |
| May 1974 | 296.00 | 280.50 | 293.60 |
| September 1974 | 301.50 | 288.00 | 300.00 |
| December 1974 | 306.50 | 292.40 | 304.90 |

After the close of the regular trading session on August 9, 1973, O'Hare purchased for Smith 21 March 1974/May 1974 straddles at a spread differential of 3.30 cents per ounce of silver, and sold 21 September 1974/December 1974 straddles at a differential of 4.90 cents per ounce. He did the same transaction at the same prices for the Jacobsons' account.

The prices affixed to the legs of Smith's and the Jacobsons' straddles on August 9, 1973, were as follows:

| Straddle | Leg | Price in cents per ounce |
|---|---|---|
| March 1974/May 1974 | (Short) March 1974 | 277.60 |
| | (Long) May 1974 | 280.90 |
| September 1974/December 1974 | (Long) September 1974 | 288.00 |
| | (Short) December 1974 | 292.90 |

With respect to the March 1974/May 1974 straddle, the price assigned to the March 1974 contract was the lowest price of

the day, while the May 1974 contract was assigned the lowest possible price, given the spread differential. With respect to the September 1974/December 1974 straddle, the price assigned to the September 1974 contract was the lowest price of the day, while the price assigned to the December 1974 contract was at the lowest possible price, given the spread differential. These prices were affixed in accordance with COMEX rules.

Smith's and the Jacobsons' positions in silver futures after the August 7, 1973, trades had included 21 long March 1974 contracts (priced at 301.10 cents per ounce) and 21 long December 1974 contracts (priced at 314.20 cents per ounce). In the course of the August 9, 1973, trades, Smith and the Jacobsons acquired 21 short March 1974 contracts (priced at 277.60 cents per ounce) and 21 short December 1974 contracts (priced at 292.90 cents per ounce). Under COMEX rules, Smith and the Jacobsons had terminated their long positions in March 1974 and December 1974 silver futures by acquiring these offsetting short positions on August 9. Thus, a "round-turn" commission was charged to each of their accounts in the amount of $1,344.

O'Hare calculated that on the March 1974 futures contracts, each account had lost (after commissions) $50,022. This, he calculated by subtracting the August 9 price of the short March 1974 leg (277.60 cents per ounce) from the August 7 price of the long March 1974 leg (301.10 cents per ounce). The difference, 23.5 cents per ounce he multiplied by 10,000 (the number of ounces in a single silver futures contract) and again by 21 (the number of contracts traded). This gave him a figure of $49,350. Adding one-half of the $1,344 commission costs, or $672, he reached the figure $50,022. Doing a similar calculation, he computed the loss on the December 1974 futures contracts to be $45,402; thus, the total loss on these two trades by his calculation was $95,424.

Despite these substantial "losses," no margin call was made on either Smith's account or the Jacobsons' account on August 9, 1973. This was because the remaining equity in these accounts was sufficient to offset any paper losses sustained.

Whereas prior to August 9, Smith and the Jacobsons had been in butterfly straddles that consisted of 21 long March 1974, 42 short July 1974, and 21 long December 1974 con-

tracts, after the straddle trading of August 9, they were effectively "switched" to a new, historically less risky[3] butter-fly straddle position: 21 long May 1974, 42 short July 1974, and 21 long September 1974 contracts. Smith and the Jacobsons remained in this new butterfly position for 6 months and 4 days.

On February 13, 1974, O'Hare liquidated all of petitioners' butterfly straddle positions. He did so by puchasing 21 May 1974/July 1974 straddles, having leg prices of 514.70 cents per ounce on the short May 1974 positions and 516.50 cents per ounce on the long July 1974 positions, and selling 21 July 1974/September 1974 straddles, having leg prices of 517.50 cents per ounce on the long July 1974 positions and 518.90 cents per ounce on the short September 1974 positions.

The long and short positions acquired on February 13, 1974, were applied to close out the butterfly positions held in petitioners' accounts since August 9, 1973. "Round-turn" commissions of $2,688 were charged to each account on February 13, 1974. O'Hare calculated that after commissions, the petitioners realized a net long-term capital gain of $90,342 in each account on closing out the August 9, 1973, butterfly straddles.

Netting the "losses" ($95,424) of August 9, 1973, against the "gains" ($90,342) of February 13, 1974, the entire investment in silver straddles had cost Smith and the Jacobsons $5,082, each. After subtracting commission costs of $4,032, their aggregate market or difference loss was $1,050, each.

On March 5, 1974, O'Hare wrote two letters to Schmidt. The letters related to Smith's account and the Jacobsons' account

---

[3]A butterfly straddle becomes less risky (1) the shorter the period between the months of the legs becomes, and (2) the more uniform the length of time separating the months of each constituent straddle in the butterfly becomes. Thus, to illustrate, petitioners' Aug. 7 butterfly straddles spanned delivery months from March 1974 to December 1974, or 9 months. Petitioners' Aug. 9 new butterfly straddles spanned delivery months from May 1974 to September 1974, or 4 months. The latter straddles were, therefore, less risky because they spanned fewer delivery months.

Additionally, the Aug. 9 straddles were more uniform or "balanced" than the Aug. 7 straddles and thus less risky on that account. The intervals separating the Aug. 7 butterfly straddles' delivery months were 4 months for the March 1974/July 1974 straddles and 5 months for the July 1974/December 1974 straddles. The intervals separating the Aug. 9 butterfly straddles' delivery months, on the other hand, were a uniform 2 months on each constituent straddle—2 months for the May 1974/July 1974 straddles, and 2 months for the July 1974/September 1974 straddles.

and were identical in all respects, except as to the account numbers in the text. The letter regarding the Smith account read as follows:

Dear Cliff:

In reviewing our completed tax straddles, I find that your account 291–59604 realized a loss last year of $95,424 and his net gain in 1974 is $90,342. This latter figure is made up of $974,526 in long-term gain on the closeout of his May and September silver position and a $884,184 short-term loss in his July position.

The overall cost of doing this business was $5,082 which is made up of $4,032 in commissions and exchange fees and a $1,050 difference loss. Since his overall cost ran approximately 5½% of the amount of money moved and the gains this year show net long-term, I would consider the entire transaction very satisfactory.

On their 1973 joint tax return, petitioners Harry Lee Smith and Patricia Ann Smith reported a short-term capital loss from "commodity transactions (silver)" of $95,424. On their 1973 joint tax return, petitioners Herbert J. Jacobson and Ruth D. Jacobson reported short-term capital losses of $50,022 attributable to "March Silver" and $45,402 attributable to "December Silver."

## OPINION

This case presents, to our knowledge, one of the first occasions for a court to rule on the deductibility of losses sustained in what is commonly referred to as a "commodity tax straddle."[4] As a preliminary matter, we note that Congress

---

[4]Two other cases, prior to the instant one, involving commodity tax straddles are worth noting here. Both cases are criminal cases. In *United States v. Turkish*, 623 F.2d 769 (2d Cir. 1980), the defendant was convicted of evading income taxes and filing false income tax returns (26 U.S.C. secs. 7201, 7206), and conspiring to defraud the United States (18 U.S.C. sec. 371), for his activities in fraudulently manipulating virtually the entire business of one trading ring on the New York Cotton Exchange, the Crude Oil Futures Market, in order to create a risk-free environment for the placing and trading of commodity tax straddles. In *United States v. Siegel*, 472 F. Supp. 440 (N.D. Ill. 1979), affd. sub nom. *United States v. Winograd*, 656 F.2d 279 (7th Cir. 1981), cert. denied sub nom. *United States v. Siegel*, 455 U.S. ___ (1982), defendants were convicted of conspiracy to defraud the United States by impairing the U.S. Treasury Department's collection of income taxes (18 U.S.C. sec. 371), aiding the preparation of fraudulent U.S. income tax returns (26 U.S.C. sec. 7206(2)), and entering into prearranged, noncompetitive, and risk-free commodity futures transactions and wash sales (7 U.S.C. sec. 6c(a)(A)), for nonbonafide trading in Mexican peso futures off the floor of the International Monetary Market.

The instant case is factually distinguishable from the above two cases in that, here, there is no dispute over the petitioners' compliance with the rules of the COMEX or applicable commodity trading laws. Additionally, petitioners herein assumed the risks of difference or

has dealt with this subject extensively in the Economic Recovery Tax Act of 1981, Pub. L. 97–34, secs. 501–509, 95 Stat. 323–335. Since the act is not intended to have retroactive application, the instant case, involving as it does trades in the years 1973 and 1974, is not governed by the act. Economic Recovery Tax Act of 1981, *supra* at sec. 508.

The device of the commodity tax straddle has been known for many years to the tax bar. See, e.g., Goldfein and Hochberg, "Use of Commodity Straddles Can Effect Impressive Tax Savings," 29 J. Tax. 342 (1968). The appeal of a commodity tax straddle is that it appears to offer a way to postpone the taxability of short-term capital gains by moving them into future years and possibly converting them to long-term capital gains, all at a minimum economic risk.

Since we have made extensive findings of what we deem to be the salient facts underlying this controversy, they will not, for the most part, be repeated here. The record contains very extensive testimony by Thomas O'Hare, the head of Merrill Lynch's tax straddle department during the years in question, and others, as to the nature and objectives of trading in commodity (specifically silver) tax straddles. The following, we believe, is an acceptable general explanation of the Federal income tax objectives of commodity tax straddles in silver based upon the entire record.[5]

The typical tax straddle in silver futures is intended to work as follows: First, the taxpayer simultaneously acquires long and short futures positions in the identical quantity of silver. The long and short futures positions are in futures contracts having different delivery months so that under the rules of the commodity exchanges and the tax laws, the long and short positions do not cancel each other out. See sec. 1233(e)(2)(B).[6]

Next, the taxpayer awaits a rise or fall in the market price of the underlying commodity. Such a rise or fall will usually

---

market losses during the duration of their commodity tax straddles. Accordingly, such cases as *Turkish* and *Winograd* are not dispositive of the tax consequences of petitioners' trades.

[5]Since this case involves silver straddles, the general description of commodity tax straddles, which follows in the body of the opinion, relates to silver straddles only. Thus, factors such as weather, etc., which affect agricultural commodities, for example, introduce additional complexities not dealt with here.

[6]All section references are to the Internal Revenue Code of 1954 as in effect during the years in issue, unless otherwise specifically indicated.

cause futures contracts prices to rise or fall in a parallel fashion. The particular direction of the market movement is immaterial to the taxpayer: If the market rises by, say, $10 (and if each delivery month's futures price also rises by $10, in sympathy), the taxpayer will have an unrealized gain of $10 in the long position, or "leg," and an offsetting unrealized loss of $10 in the short position, or "leg." If the market falls by $10, on the other hand, the taxpayer will have a $10 unrealized loss in the long leg and a $10 unrealized gain in the short leg. In either case, the taxpayer has one loss leg and one gain leg with economically offsetting unrealized gains and losses of $10 each.

As stated above, the goal of a silver tax straddle is to "move" a certain quantity of short-term capital gain into a future year and possibly convert it into a long-term capital gain. Assume, for example, that the amount of short-term capital gain the taxpayer desires to move is $25. To move that $25, the taxpayer must hope for the market price of silver (and the parallel-traveling delivery months' futures prices) to rise or fall by $25. At this point, one leg of the straddle will possess an unrealized gain of $25 and the other an unrealized loss in that amount. The taxpayer then proceeds to the next step: the liquidation of the loss leg position and the realization of the $25 loss.

If the loss leg was held for less than 6 months before it was liquidated (and assuming the taxpayer was not in the commodities market as an integral part of his other businesses),[7] the closing of the loss leg will produce a claimed $25 short-term capital loss. This $25 short-term capital loss will offset the $25 short-term capital gain which originally prompted the straddle.

At this point, only one leg of the initial straddle remains. This leg possesses an unrealized gain of $25. If the taxpayer can postpone realization of the gain until the next taxable year, he will have succeeded in shifting the $25 short-term capital gain from one taxable year to the next. If, in addition, he has held the remaining leg over the requisite holding period to convert it to long-term at the time of final liquidation, and

---

[7]See *Corn Products Refining Co. v. Commissioner*, 350 U.S. 46 (1955).

this gain leg was the long leg of the initial straddle (see sec. 1233(b)), he will have realized a long-term, rather than short-term, capital gain of $25 in the second taxable year. In this latter instance, the goals of both deferral and conversion of the short-term capital gain will be claimed to have been realized. In the event that the short leg of the initial straddle produced the gain, on the other hand, only the goal of deferral would be claimed. See sec. 1233(b).

The taxpayer locks in the $25 unrealized gain by acquiring a new offsetting futures position (either long or short, as required) in an as yet unused delivery month. This new delivery month's prices will also be expected to move in tandem with the gain leg's delivery month's prices. The taxpayer then holds this new straddle position for the period necessary to achieve deferral and possible conversion (i.e., into the next year and over the requisite long-term holding period), and then liquidates both legs of this new straddle. This effectively locks in the $25 of unrealized gain no matter how volatile the underlying price of the commodity is during this holding period (assuming parallel futures price movements): any loss from price movement in the gain leg's delivery month will be compensated for by an offsetting gain from price movement in the new leg's delivery month, and vice versa. Upon liquidating this new straddle position, the taxpayer will claim to have realized a net capital gain of $25.

In the event that only the goal of deferral has been realized, and not that of converting the gain to long-term, the taxpayer may go back to step one in the second taxable year and straddle again to move the short-term capital gain from the second year to the third year. In fact, if petitioners' analysis of the tax law is correct, nothing but commission costs and death would prevent a taxpayer from perpetually straddling, achieving perhaps the ultimate tax goal of permanent deferral of taxation of an initial short-term capital gain.

A commodity tax straddle employing "butterfly" straddles works generally on the same principle as the typical commodity tax straddle described above, but with less economic risk. A butterfly straddle is, in essence, two separate straddles—one, for example, which is long March 1974/short July 1974 and another which is short July 1974/long December 1974. Thus, a butterfly straddle is one in which the positions are a combina-

tion of two separate straddles having one common intermediate delivery month.

If the market price of silver futures rises after the butterfly position in the example above is acquired, the two short July 1974 legs are loss legs which will be disposed of; if the market price of silver futures falls, the long March 1974 and long December 1974 legs are the loss legs to be disposed of. In the latter example, there will be gain in the short July 1974 legs which can be locked in by acquiring, for example, new long May 1974 and long September 1974 positions, achieving a new butterfly straddle position. As indicated earlier, butterfly straddles are often employed in preference to using an equal number of straddles sharing common delivery months in *both* legs of the straddles, the reason being that a butterfly position reduces even further the risk of "difference" loss or gain—i.e., the net difference (exclusive of commission costs) between loss and gain when all of the positions have been closed out.

With this background in mind, we turn now to the specifics of this case. On August 7, 1973, after the close of the COMEX regular trading session and during the after-hours trading session of that date, O'Hare sold 21 March 1974/July 1974 straddles and purchased 21 July 1974/December 1974 straddles, each, for both Smith's account and the Jacobsons' account. As we have set out in our findings of fact, August 7 was a day on which the prices of silver futures fluctuated widely during the regular trading session. Contracts of March 1974 silver and December 1974 silver traded as high as 302.30 cents per ounce and 314.20 cents per ounce, respectively, and as low as 290.00 cents and 306.00 cents, respectively. Settlement prices at the end of the regular trading session were near the lows of the day: 291.20 cents per ounce and 306.10 cents per ounce for March 1974 and December 1974 silver, respectively.

O'Hare sold the March 1974/July 1974 straddles at a spread price of 6.60 cents per ounce and purchased the July 1974/December 1974 straddles at a spread price of 8.30 cents per ounce. These spread differential amounts reflected, to within 0.10 cents per ounce, the spread differentials between the settlement prices of March 1974, July 1974, and December 1974 silver at the close of the regular trading session.

Pursuant to COMEX rules, the buyers and sellers of

straddles in the after-hours session were given fairly wide latitude to agree on the respective prices to be assigned to the legs of the straddles they bought and sold. Under the rules, buyers and sellers of straddles could agree to price the long and short legs of the straddles using any prices at which the respective legs had traded during the regular trading session.[8] The only limitation on the choice of these leg prices was that the spread differential between the prices had to exactly reflect the spread at which the straddle was actually bought and sold.

O'Hare took maximum advantage of this pricing latitude. He assigned prices to the legs of the March 1974/July 1974 straddles and July 1974/December 1974 straddles at the highest possible prices of the day, given the spread limitation. This he did despite the fact that settlement prices had been near the lows of the day's prices. By choosing prices deviating substantially upward from the actual closing, or "settlement," prices on the trading day, O'Hare, in effect, locked in substantial unrealized losses in the March 1974 and December 1974 long legs of the straddles and locked in equally offsetting unrealized gains in the short July 1974 legs of the straddles. That is to say, if O'Hare had immediately closed out each of the long legs of the straddles by selling those legs short at their respective settlement prices, he would already have achieved substantial short-term capital losses and been well on his way to completing his tax straddle.

Despite the fact that O'Hare had generated large unrealized gains and losses by assigning artificially high prices to the various legs of the straddles on August 7, which he could have closed out at a loss at the opening of the market on the following day, he instead waited 2 days, until August 9, 1973, to close out the loss legs.

On August 9, as they had on August 7, silver futures prices fluctuated widely. March 1974 silver traded in a range of prices from a low of 277.60 cents per ounce to a high of 291.00 cents per ounce, with a closing settlement price of 290.30. December 1974 silver traded in a range of 292.40 to 306.50, with a settlement price of 304.90.

---

[8] If there was no trading range for the particular leg in the regular trading session, a different rule, not relevant here, applied.

At this point, again after regular trading hours, O'Hare performed a "switch," taking Smith and the Jacobsons out of their March 1974/July 1974/December 1974 butterfly straddle position and placing them into a May 1974/July 1974/September 1974 butterfly. O'Hare did this by purchasing 21 March 1974/ May 1974 straddles at a spread differential of 3.30 cents per ounce and selling 21 September 1974/December 1974 straddles at a spread differential of 4.90 cents per ounce for each of the two accounts. The spread differential amounts reflected, this time, exactly the spread differentials between the settlement prices of March 1974 and May 1974 silver and September 1974 and December 1974 silver on August 9. These straddle trades accomplished the dual purposes of (1) acquiring sufficient short March 1974 and short December 1974 contracts to close out at a loss all the long March 1974 and long December 1974 contracts from the August 7 straddle trades, and (2) acquiring new long positions in May 1974 and September 1974 silver to lock in and protect the unrealized gain in the short July 1974 legs of the August 7 straddles.

Once again, on August 9, O'Hare took advantage of the special COMEX straddle-pricing rule to enhance the losses realized on the March 1974 and December 1974 legs of the straddles. Despite the fact that settlement prices were near the highs of the day's trading ranges on August 9, O'Hare assigned the lowest possible prices, given the spread differential limitations, to the short March 1974 and short December 1974 legs of the new straddles he traded that day. By so doing, O'Hare increased the size of the losses realized on closing out the March 1974 and December 1974 legs of the August 7 straddles, while at the same time locking in an additional amount of offsetting unrealized gain into the new butterfly position.

To illustrate the degree to which O'Hare enhanced the losses on the long legs of the initial straddles, the petitioners each claimed $95,424 of losses (after commissions of $1,344) resulting from opening and closing the long March 1974 and long December 1974 legs of the straddles employing the prices chosen by O'Hare. If instead of O'Hare's prices, the petitioners had priced their straddle legs according to settlement prices for March 1974 and December 1974 silver on August 7 and

August 9, they would have each reported losses of only $5,754, after commissions, on closing out the legs.[9] (Indeed, if O'Hare had chosen the lowest prices of the day on August 7 and the highest prices of the day on August 9, under the COMEX rules, he could even have turned the $95,424 of claimed losses into $756 of gains, after commissions.)[10]

---

[9]The $5,754 figure is calculated as follows: On Aug. 7, the settlement price of March 1974 silver was 291.20 cents per ounce of silver; on Aug. 9, the settlement price was 290.30. Multiplying the difference between those two figures, 0.90 cents per ounce, by 21 (the number of March 1974 contracts bought and sold for each account) and again by 10,000 (the number of ounces in each futures contract), we arrive at a figure of 189,000 cents, or $1,890 of loss. On Aug. 7, the settlement price of December 1974 silver was 306.10; the settlement price was 304.90 on Aug. 9. (306.10 - 304.90) × 21 × 10,000 = 252,000 cents, or $2,520 of loss on the December 1974 contracts. Adding together the loss of $1,890 on the March 1974 contracts, the loss of $2,520 on the December 1974 contracts, and the $1,344 of commissions charged, we reach a total loss of $5,754.

Use of the settlement prices for March 1974 and December 1974 silver was possible given the COMEX spread pricing limitations. If settlement prices for March 1974 and December 1974 silver had been used, the following prices would have had to have been attached to the other legs of the various straddles:

| Contract | Settlement price | Petitioners' spread | Month of other leg | Price of other leg as required by COMEX rules |
|---|---|---|---|---|
| March 1974: | | | | |
| Aug. 7 | 291.20 | + 6.60 | July 1974 | 297.80 |
| Aug. 9 | 290.30 | + 3.30 | May 1974 | 293.60 |
| December 1974: | | | | |
| Aug. 7 | 306.10 | − 8.30 | July 1974 | 297.80 |
| Aug. 9 | 304.90 | − 4.90 | September 1974 | 300.00 |

(All figures are in cents per ounce of silver.)

All of the prices in the last column of the above chart were prices at which the other leg's delivery-month contracts actually traded on the respective days. Thus, COMEX rules would have been satisfied.

[10]The $756 figure is calculated as follows: First, the lowest prices of the day on Aug. 7 and the highest prices of the day on Aug. 9, given the relevant COMEX pricing limitations, were determined as follows:

| Date | Contract | Cents per ounce | | |
|---|---|---|---|---|
| | | Price | | Differential |
| Aug. 7 | March 1974 | 290.40 | | |
| | July 1974 | 297.70 | = | 6.60 |
| | July 1974 | 297.70 | | |
| | December 1974 | 306.00 | = | 8.30 |
| Aug. 9 | March 1974 | 291.00 | | |
| | May 1974 | 294.30 | = | 3.30 |
| | September 1974 | 301.50 | | |
| | December 1974 | 306.40 | = | 4.90 |

Thus, petitioners could have bought March 1974 silver at 290.40 cents on Aug. 7 and sold the

After August 9, 1973, O'Hare simply held Smith and the Jacobsons in their new May 1974/July 1974/September 1974 butterfly positions. On February 13, 1974, 6 months and 4 days after the new butterfly was established (and in a new taxable year for petitioners), O'Hare closed out all the positions.[11] O'Hare calculated a net long-term capital gain of $90,342 would have to be reported in 1974. Thus, O'Hare had achieved the goals of each of his clients—viz, to defer $85,000 of short-term capital gain from 1973 to 1974 and to convert that gain from short-term to long-term. On the entire series of transactions, Smith and the Jacobsons each incurred commission costs of $4,032 and "difference losses" of $1,050, for a total loss of $5,082 in each account.

Respondent seeks to disallow the full $95,424 each of short-term capital losses claimed by the Smiths and the Jacobsons on their respective 1973 tax returns. He makes the following alternative arguments in support of his position:

(1) There were no genuine losses realized;

(2) The alleged losses were but one step in a series of transactions which must be integrated and recognized only upon conclusion of the scheme in 1974;

(3) The transactions lacked economic substance; and

(4) The losses, if real, were not deductible under section 165(c)(2) because they were not incurred in a transaction entered into for profit.[12]

To these arguments, petitioners and amicus respond:

(1) Straddles are not shams, but rather, are economically useful investments with significant nontax consequences;

same at 291.00 cents on Aug. 9, had they chosen to use these prices. Using the same formula as in note 9 *supra*, this would have yielded a profit, before commissions, of (291.00 - 290.40) × 21 × 10,000 = 126,000 cents, or $1,260, on the closing of the March 1974 silver position. Petitioners could also have bought December 1974 silver at 306.00 cents on Aug. 7 and sold the same at 306.40 cents on Aug. 9; this would have yielded a profit, before commissions, of (306.40 - 306.00) × 21 × 10,000 = 84,000 cents, or $840. Adding the $1,260 profit on March 1974 silver to the $840 profit on December 1974 silver, and subtracting commission costs of $1,334, petitioners' accounts would each show a net profit of $756.

[11]Prior to 1977, sec. 1222 required that capital assets be held more than 6 months to achieve long-term gain treatment.

[12]Respondent in his brief also draws attention to sec. 446 which allows the Commissioner to recompute taxable income where the taxpayer's method of accounting does not clearly reflect income. This reference is at best a passing one, useful for purposes of analogy only, and we do not understand respondent to argue that sec. 446 is applicable herein. Accordingly, we express no opinion as to how sec. 446 might apply to the instant case.

(2) Prior case law has treated futures contracts with different delivery months as independent entities; where an offsetting futures position in the delivery month in which the taxpayer already holds a position is acquired, the initial position is closed out, and gain or loss is recognized;

(3) Congressional activity and inactivity indicate that losses arising out of a commodity tax straddle should be recognized;

(4) Respondent's step-transaction argument would effectively write a wash sale provision into the Internal Revenue Code for commodity futures trading where, as respondent concedes in Rev. Rul. 71–568, 1971–2 C.B. 312, none now exists; and

(5) Straddling presents real possibilities for gain and loss; and petitioners possessed adequate nontax profit objectives to avoid disallowance of their straddle losses on the basis of section 165(c)(2).

Having laid out the various positions of the parties in this summary fashion, we now proceed to address each of their arguments in a somewhat different order as we chart our own view of the deductibility of petitioners' claimed losses. For the moment, we put aside respondent's arguments that petitioners' losses should be disallowed in 1973 because (1) the losses must be integrated with the gains and not recognized until 1974, or (2) the losses were not incurred in a transaction entered into for profit within the meaning of section 165(c)(2). Each of these two arguments presupposes the existence of some measurable "loss" subsequently disallowed or integrated so as not to be deductible in the particular taxable year allegedly realized. While there may in fact have been losses in 1973 arising out of petitioners' transactions, we do not think it at all obvious based on the statute and prior case law that this was the case. Thus, our first inquiry is directed at what measurable losses, if any, resulted from petitioners' straddle trading in 1973.

Each of the following four elements is necessary in order to measure the amount of a loss: First, a unit of property must be acquired. Second, a closed and completed transaction, fixed by identifiable events, must occur during the taxable year. Sec. 1.165–1(b), Income Tax Regs. Third, a basis must be determined for the property. Secs. 1.165–1(c)(2), 1.1002–1(a), 1.1001–1(a), Income Tax Regs. Fourth, an amount realized in the

closing transaction must be ascertained. Secs. 1.165–1(c)(2), 1.1002–1(a), 1.1001–1(a), Income Tax Regs.

### *What Was the Unit of Property, if any, Acquired?*

On August 7, petitioners bought and sold as units certain silver straddles. These straddles were each composed of a short July 1974 leg and either a long March 1974 leg or a long December 1974 leg. Our first question must be: Were any units of property actually acquired by petitioners on that date?

Courts have often held that a long or short commodity futures position is acquired for tax purposes when a long or short position is traded by a broker over a recognized commodity exchange and recorded on the exchange's books. See, e.g., *Valley Waste Mills v. Page*, 115 F.2d 466, 467 (5th Cir. 1940); *Maloney v. Commissioner*, 25 T.C. 1219 (1956). "It is the contract itself with its specific terms, rather than a quantity of a fungible commodity, which constitutes 'property held by the taxpayer' within the definition of the term 'capital assets' prescribed by section 117(a)(1) of the 1939 Code [sec. 1221 of the 1954 Code]." *Maloney v. Commissioner, supra* at 1228. Petitioners here, however, did not merely acquire a long *or* short position on August 7; rather, petitioners claim to have acquired equal long *and* short positions that day. Did these positions cancel each other out such that no property was acquired for tax purposes on August 7? We think not.

In *Maloney v. Commissioner, supra*, the full Tax Court was presented with the following situation: The taxpayer on August 11, 1949, entered into two futures positions on the Chicago Board of Trade, one for the purchase of 50,000 bushels of May soybeans in "job-lot" quantities (1,000 bushels per contract) and the other for the sale of 50,000 bushels of May soybeans in "round-lot" quantities (5,000 bushels per contract). He closed out his short position in round lots by offsetting purchases of round lots during the months November 1949 through February 1950, but maintained his long position in job lots for over 6 months, closing out the latter by an offsetting sale of May soybeans in job-lot quantities on April 25, 1950. Respondent argued that in substance the taxpayer's positions of August 11, 1949, offset each other and canceled each other out for tax purposes.

The Court rejected respondent's argument and held that the

trades of August 11, 1949, did result in the taxpayer's acquiring property on that date. The Court cited the following factors to support its holding that the taxpayer's long position and short position should not be offset for tax purposes: First, round-lot and job-lot contracts were cleared and traded separately on the Chicago Board of Trade. Second, the Secretary of Agriculture did not consider the establishment of simultaneous positions in job lots and round lots to be fictitious in nature. Third, a price differential usually existed between the prices of round-lot contracts and those of job-lot contracts. Finally, the class of investors, primarily smaller consumers of grain, trading in job lots differed from the class of investors trading in round lots. *Maloney v. Commissioner, supra* at 1227.

The argument for recognizing the petitioners' acquisition of property in the instant case on August 7, 1973, is, we believe, equally compelling: First, under the rules of the COMEX, silver futures positions in different delivery months were not considered offsetting and were required to be accounted for separately. Second, petitoners' straddles would also apparently be recognized as real by the Secretary of Agriculture, not requiring automatic offsetting. See 17 C.F.R. sec. 1.46 (1973), a regulation under the Commodity Exchange Act entitled "Application and closing out of offsetting long and short positions."[13] Third, a price differential usually existed between the prices of July 1974 silver contracts and those of March 1974 and December 1974 contracts.

In addition to the above reasons, we believe that section 1233 and its legislative history implicitly recognize the existence of a straddle in futures having different delivery months. Section 1233, originally added to the Code as section 117(1) of the 1939 Code by the Revenue Act of 1950, Pub. L. 814, ch. 994, sec. 211(a), 64 Stat. 933, was designed to close a perceived tax loophole whereby, through the use of short sales, taxpayers had been able to convert short-term capital gains into long-term capital gains and long-term capital losses into short-term capital losses by the holding of simultaneous long and short positions in substantially identical property.

---

[13]See also an example of a tax straddle employing short and long positions in different delivery months in U.S. Department of Agriculture, Commodity Exchange Authority, "Futures Trading and Income Tax" 2–5 (December 1947).

A typical example of where section 1233 was to apply is as follows: On January 2, the taxpayer assumes a long position in 1 share of stock or one futures contract for $10. On April 4, after the price of the stock or futures contract has risen by $2, the taxpayer assumes a short position in 1 share of the identical stock or identical futures contract for $12, but instructs his broker not to use the long position to close out the short position. Thus, the taxpayer, for all intents and purposes, has locked in a gain of $2 in his initial investment in less than 6 months; he is no longer at any risk of price fluctuation after April 4 (future loss in one position will be exactly offset by a gain in the other position). On July 3, the taxpayer places new offsetting orders for long and short positions of 1 share or one contract, each, of the same stock or future at a price of $12.50. The taxpayer then instructs his broker to use the newly acquired positions to offset the positions assumed on January 2 and April 4. Under prior law, assuming exchange rules permitted such broker behavior, on July 3, the taxpayer would realize a long-term capital gain[14] of $2.50 on the January 2 long position and a short-term capital loss of $0.50 on the April 4 short position. See example *3*, H. Rept. 2319, 81st Cong., 2d Sess. (1950), 1950–2 C.B. 380, 422. See also *Griffin v. Commissioner*, 45 B.T.A. 588 (1941); *Bingham v. Commissioner*, 27 B.T.A. 186 (1932). Section 1233 was designed essentially to prevent the characterization of long-term capital gain to attach to the long position in the above example since the taxpayer's real risk of gain or loss in the transactions ended on April 4, before the end of the 6-month long-term holding period. Accordingly, under section 1233(b), on July 3, the taxpayer in the above example would be treated as sustaining a short-term capital gain of $2.50 on his long position and a short-term capital loss of $0.50 on his short position, for a net short-term capital gain of $2.

Section 1233 speaks to the characterization of gain or loss as short-term or long-term, but it does not alter prior law as to the time for realizing gain or loss in the transactions to which it is addressed. *Hendricks v. Commissioner*, 423 F.2d 485 (4th Cir. 1970), affg. on this point 51 T.C. 235 (1968); *Doyle v.*

---

[14]Assuming a "more than 6 months" holding-period rule applied.

*Commissioner*, 286 F.2d 654 (7th Cir. 1961), revg. and remanding a Memorandum Opinion of this Court. See also example at sec. 1.1233–1(d)(2)(iii), Income Tax Regs. Nevertheless, a provision of section 1233 seems to implicitly recognize that offsetting futures positions in different delivery months do not cancel each other out for tax purposes. Subsection (e)(2)(B) provides that for purposes of applying the gain or loss characterization rules of section 1233:

(B) in the case of futures transactions in any commodity on or subject to the rules of a board of trade or commodity exchange, a commodity future requiring delivery in 1 calendar month shall not be considered as property substantially identical to another commodity future requiring delivery in a different calendar month; * * *

Section 1233 prevents the conversion of the character of gain or loss (from short-term to long-term, and vice versa) when the taxpayer holds offsetting positions in substantially identical property. If the mere holding of offsetting positions in futures of different delivery months were a complete nullity for tax purposes, then no gain or loss on such offsetting positions could occur in the first place, and a provision like section 1233(e)(2)(B) exempting futures in different delivery months from the gain or loss conversion rules of section 1233(b) and (d) would be entirely superfluous. We do not think this is what Congress had in mind when it enacted the short sale rules. The legislative history of section 1233 indicates that Congress was primarily concerned about the holding of offsetting long and short positions in commodity futures having the same delivery month, but on different commodity exchanges. See example *3*, H. Rept. 2319, *supra*, 1950–2 C.B. at 422. It intended to subject these straddles in futures of the same delivery month to the short sale rules. But it did not wish to extend the gain or loss conversion rules to straddles in different delivery months. By providing such an exemption at section 1233(e)(2)(B), we think Congress implicitly recognized that the holding of offsetting positions in futures having different delivery months was not a complete nullity for tax purposes. This buttresses our conclusion that petitioners acquired property on August 7.

Having concluded that petitioners did acquire property, our next inquiry is whether the property so acquired should be treated as indivisible straddle units or severable long and

short positions in March 1974, July 1974, and December 1974 silver futures. Unlike the situation in *Maloney v. Commissioner, supra,* the petitioners' straddles were not achieved through separate trading of the legs, but rather in one combined trade.

It has been suggested by commentators[15] that perhaps a straddle should be treated as an economic unit for tax purposes so that, upon closing out one leg of the straddle, realization of gain and loss in both legs would be triggered. This approach indeed has much to recommend it from an economic standpoint. Nevertheless, we reject it for tax purposes for the following reasons: First, it would require that at the exact moment the first leg of the straddle was sold over the exchange, a price be calculated for the remaining leg so that gain or loss in the remaining leg could also be recognized. Considering the high volatility of commodity markets, problems of proving what the untraded leg's price was at the exact moment of the other leg's trade, we suspect, would be enormous. Second, it would introduce an element of arbitrariness into the law; if a straddle were achieved by trading one leg at a time, disposing of one leg would only trigger gain or loss in that leg (see *Maloney v. Commissioner, supra*), but if the straddle were achieved in one simultaneous trade, disposing of one leg would trigger gain and loss in both legs—notwithstanding the identical economic character of the two straddles.[16] Thus, we conclude that what petitioners acquired on August 7, 1973, were, for tax purposes, separate long and short positions in March 1974, July 1974, and December 1974 silver futures.

### A Closed Transaction

Section 1.165–1(b), Income Tax Regs., provides: "To be

---

[15]See Goldfein and Hochberg, "An analysis of IRS' Ruling that straddle transactions lack requisite profit motive," 47 J. Tax. 142, 145 (1977); Dailey, "Commodity Straddles in Retrospect: Federal Income Tax Considerations," 47 Brooklyn L. Rev. 313, 345–346 (1981).

[16]This combined approach may also depart from what scant case law there is regarding the treatment of simultaneously placed commodity straddles. Neither petitioner, nor respondent, nor amicus has pointed us to any case involving the taxation of simultaneously placed commodity straddles, and we are aware of only one case of this type, *Arnall v. United States,* an unreported District Court decision (N.D. Ga. 1959, 4 AFTR 2d 5975, 59–2 USTC par. 9779). In *Arnall,* the taxpayer acquired a straddle position in long May 1951/short July 1951 cotton in a presumably simultaneous trade with Magnet Brothers, Inc., on July 12, 1950. In determining the tax consequences of closing out the straddle on Dec. 14, 1950, the court accorded separate treatment for tax purposes to the straddle's constituent legs.

allowable as a deduction under section 165(a), a loss must be evidenced by closed and completed transactions, fixed by identifiable events, and * * * actually sustained during the taxable year." Petitioners assert that when on August 9, 1973, they acquired short March 1974 and short December 1974 silver positions (as constituent legs of the straddles they traded that day) and applied those short positions to close out their long March 1974 and long December 1974 positions acquired 2 days previously, a closed and completed transaction occurred triggering the realization of loss. The fact that they simultaneously replaced their long March 1974 and long December 1974 positions on August 9 with long May 1974 and long September 1974 positions, they argue, does not alter this result. We agree.

The Fifth Circuit Court of Appeals faced this very question in *Valley Waste Mills v. Page*, 115 F.2d 466 (5th Cir. 1940). In *Valley Waste Mills*, the taxpayer sought to maintain a continuous long position in cotton futures. As the delivery months of the positions the taxpayer held approached, the taxpayer would close out each long position by selling an offsetting amount of cotton futures for that delivery month and acquiring equal long futures positions in more distant delivery months. The taxpayer claimed that taxable gains or deductible losses from its transactions resulted only when, in closing out a cotton contract, it did not simultaneously purchase another contract for the future delivery of a like amount of cotton. The court disagreed, holding that gains or losses on the initial positions were to be recognized for tax purposes at the time of each "switch:"

> Appellant argues that the effect of its operations was merely to switch the delivery dates of its future contracts, but we do not so construe the agreed statement of facts; and it is admitted that switching of delivery dates is not permissible under the rules of either of the exchanges on which these sales and purchases were made. Each contract was treated as separate and independent by the parties themselves, doubtless separate commissions were charged for each transaction, and the appellant should not be permitted to combine, for income-tax purposes, that which the parties have elected to make separate and independent for all other purposes. [115 F.2d at 468.]

The Board of Tax Appeals followed the decision in *Valley Waste Mills v. Page, supra,* when presented with the same fact situation in *Harriss v. Commissioner*, 44 B.T.A. 999 (1941), affd. 143 F.2d 279 (2d Cir. 1944). And the Tax Court reaffirmed

this position in *Corn Products Refining Co. v. Commissioner*, 16 T.C. 395 (1951), affd. 215 F.2d 513 (2d Cir. 1954), affd. on another issue 350 U.S. 46 (1955).

Accordingly, we hold that when petitioners acquired 21 short March 1974 legs and 21 short December 1974 legs each, and applied these legs to close out their long positions in these delivery months on August 9, their transactions in March 1974 silver and December 1974 silver were closed for tax purposes; gain or loss was sustained at that time.

### Basis

Part of petitioners' argument proceeds from an unjustified declaration that "the basis of the property is stipulated and there is no dispute as to the amount of the gain or loss realized from either the August 9, 1973 or the February 13, 1973 [sic] transaction." What, in actual fact, were stipulated were the prices arbitrarily affixed by O'Hare to the legs of the straddles, and the gain or loss "realized" based upon these prices.

Petitioners assert that they have bases in their March 1974 and December 1974 straddle legs of 301.10 cents per ounce and 314.20 cents per ounce, respectively. These figures they take from the prices which O'Hare affixed on August 7, 1973, to the legs of petitioners' butterfly straddles pursuant to COMEX rules. We reject the use of these figures to measure petitioners' bases. These prices did not reflect economic reality at the time the straddles were traded and were not the product of an economically adversarial (or tax-consequence adversarial) process.

Petitioners' prices exceeded the settlement prices of March 1974 and December 1974 silver on August 7, by 9.90 cents per ounce and 8.10 cents per ounce, respectively. Settlement prices represent, in essence, the fair market value of futures contracts at the end of the regular trading session each day. No further trading in individual contracts occurs until the following day. Thus, we think it fair to say that at the time petitioners' straddles were traded in the after-hours straddle trading session, the fair market values of the legs of the straddles traded equaled the settlement prices of the legs at the close of the day's trading session—the last time there actually was a market for the individual legs. Consequently, petitioners' prices, notwithstanding the fact that they were

acceptable under COMEX rules, did not reflect economic reality at the time of their straddle trades.

Neither were petitioners' prices the product of an economically adversarial or tax-consequence adversarial process. While the *relative* prices of straddle legs are of great economic consequence to a straddle trader, the *absolute* prices have little or no economic significance.[17] The buyer or seller of a straddle suffers no economic benefit or detriment by agreeing to leg prices above the market or below the market. To the extent that one leg is economically deprived of its true value by such pricing, the other leg's value is equally enhanced. While overpricing or underpricing of the legs may result in a different timing of recognition of gain or loss if the straddle is closed out one leg at a time, it will not affect the net economic gain or loss realized by straddling after both legs of the straddle are ultimately closed. Consequently, there is no economic (i.e., nontax) tension to the setting of any particular absolute price on the leg of a simultaneously traded straddle.

In addition, there is no real tension in tax consequences in the assigning of artificially high or low prices to the legs of a straddle. For illustration, if both buyer and seller set the prices of the legs of a silver straddle 10 cents per ounce above the true market prices, both buyer and seller will be holding one long leg with an unrealized loss of 10 cents per ounce and one short leg with an unrealized gain of a like amount. Each could immediately thereafter dispose of his long leg to a third party at the market price realizing a 10-cent short-term capital loss. Thus, both buyer and seller would have completed the first steps of a 10-cent commodity tax straddle (see explanation above). In fact, the farther from the true market prices the buyer and seller agree to set the leg prices, the larger the potential tax straddle benefit to each. In sum, tax conse-

---

[17]That a straddle trader's true economic interest is in the width of the spread was recently recognized in *Chipser v. Kohlmeyer & Co.*, 600 F.2d 1061 (5th Cir. 1979), a nontax case. In *Chipser,* the defendant broker was alleged to have improperly removed the plaintiff from a straddle position in July 1973 and December 1973 wheat futures without the plaintiff's authorization. The plaintiff sought monetary compensation for this premature removal. In determining the amount of damages for which the broker could be held liable, the court stated: "an award of damages measured by the difference between the spread at the time Chipser's contracts were liquidated and the spread at the time he is deemed to have decided to stay out of the market would justly compensate him." 600 F.2d at 1068.

quences are not adverse in the setting of the leg prices between buyer and seller.[18]

In any case, petitioners' prices are not determinative of their bases for tax purposes. When, on August 7, petitioners acquired positions in each of the two accounts of 21 long March 1974 contracts, 42 short July 1974 contracts, and 21 long December 1974 contracts, they did so for a net cash outlay of 1.7 cents per ounce of silver on each of the 21 butterfly straddles, or $3,570 per account.[19] Petitioners traded their butterfly straddles with other Merrill Lynch customers who thereby acquired an equal number of mirror-image straddles (i.e., short March 1974/long July 1974/short December 1974) and were credited with petitioners' cash. Petitioners argue (1) that they sold July 1974 silver futures contracts to these other customers at prices of 307.70 cents per ounce on 21 of the July 1974 contracts in each account and 305.90 cents per ounce on the remaining 21 July 1974 contracts in each account; (2) that they bought simultaneously from the same customers 21 March 1974 contracts in each account at a price of 301.10 cents per ounce and 21 December 1974 contracts in each account at a price of 314.20 cents per ounce; and (3) that they paid $3,570 in each account for the differential between the cost of contracts acquired and the cost of contracts sold.

While petitioners ask us to treat their purchases and sales on August 7 as independent trades, we think to do so would do violence to the reality of their situation. Petitioners were not buying futures from one person and independently selling them to others; they were buying and selling futures simultaneously with the same person, and their lower margin requirements for these straddle trades reflect that difference. They were selling assets (July 1974 futures contracts) to the same person or persons from whom they were buying assets

---

[18]This lack of any pressure from economic or tax consequences to force the parties to set reasonable leg prices perhaps explains why O'Hare, on Aug. 7, cross-traded butterfly straddles (including petitioners') between his customers at the maximum deviation from settlement prices allowable under the COMEX rules. Absent our above illustration of how artifically overpricing or underpricing straddle legs could benefit both the buyer and seller taxwise, a casual observer might be surprised at O'Hare's conduct.

[19]21 butterfly straddles $\times$ 1.7 cents per ounce $\times$ 10,000 ounces per contract = $3,570.

(March 1974 and December 1974 futures contracts) and paying cash only to the extent necessary to induce the person(s) to engage in the simultaneous purchases and sales. The situation we have just described—a mutually dependent sale and purchase of assets between two parties—is, in actuality, an exchange.

The rule has been long settled that when assets are received in exchange for other assets (with or without boot), the basis of the property received in the exchange is not the price employed by the parties, but, rather, the fair market value of the property received.[20] *Rodman v. Commissioner*, 57 T.C. 113 (1971); *Williams v. Commissioner*, 37 T.C. 1099 (1962). We are here concerned with the bases of the 21 March 1974 contracts and 21 December 1974 contracts that petitioners received in exchange for 42 July 1974 contracts plus $3,570 in each account on August 7. We have found as a fact that commodity-customer trading accounts are "marked for market" daily to compute their equity. In marking each account for market, settlement prices are used to value each contract. Employing settlement prices on that date as the best available measure of

---

[20]This is true even where there is an apparent discrepancy between the fair market value of the property received in the exchange and the fair market value of the money and property given up in the exchange. Such a discrepancy—$420—exists in the instant case. The fair market value of the property given up, 42 July 1974 silver contracts, plus the amount of money petitioners each actually paid for their 21 butterfly straddles, amounts to $1,254,750, calculated as follows: 42 contracts × 297.90 cents per ounce (the Aug. 7 settlement price of July 1974 silver) × 10,000 ounces per contract = 125,118,000 cents, or $1,251,180. To the above figure must be added the cash outlay for 21 butterfly straddles at a net cost of 1.70 cents per ounce, each (8.30 cents per ounce paid for each July 1974/December 1974 straddle minus 6.60 cents per ounce received for each March 1974/July 1974 straddle, using petitioners' pricing), or 21 × 1.70 × 10,000 = 357,000 cents, or $3,570. $1,251,180 + $3,570 = $1,254,750.

The fair market value of the property received in each of the two accounts, on the other hand, was $1,254,330, calculated as follows: 21 contracts × 291.20 cents per ounce (the Aug. 7 settlement price of March 1974 silver) × 10,000 ounces per contract = 61,152,000 cents, or $611,520. Add to this latter figure 21 contracts × 306.10 cents per ounce (the Aug. 7 settlement price of December 1974 silver) × 10,000 ounces per contract = 64,281,000 cents, or $642,810. For a sum of ($611,520 + $642,810) $1,254,330.

The reason for the difference between the fair market value of the property received ($1,254,330) and the fair market value of property and cash given up ($1,254,750), $420, cannot be discerned from the record before us.

We note respondent makes no argument that sec. 1031, providing for nonrecognition of gain or loss on the exchange of certain property, is applicable to petitioners' transactions. Accordingly, we express no opinion as to the applicability of sec. 1031 to the instant case, but query whether a commodity futures contract falls within the parenthetical itemization of sec. 1031(a).

the fair market value of the property received after the close of the regular market, we hold that petitioners acquired bases of $611,520 for the 21 March 1974 silver contracts and $642,810 for the 21 December 1974 silver contracts in each of the two accounts.[21]

## Amounts Realized

On August 9, 1973, petitioners closed out their long March 1974 and long December 1974 positions by acquiring equal, offsetting short positions in those months' futures. Petitioners claim the amounts realized in closing out the March 1974 and December 1974 positions were 277.60 cents per ounce per contract and 292.90 cents per ounce per contract, respectively. Again, we disagree with petitioners' assertions.

The prices assigned by petitioners to the short March 1974 and short December 1974 positions acquired on August 9 suffer from the same lack of economic reality as the prices they assigned to the long positions in those delivery months on August 7. The short March 1974 and short December 1974 positions were acquired as constituent parts of two new simultaneously traded straddles on August 9. While there is no evidence in the record that these new straddles were cross-traded with other Merrill Lynch customers, nevertheless, the prices assigned indicate a desire to achieve a maximum departure from the day's settlement prices, this time in a downward direction. These August 9 prices, deviating as they do from actual settlement prices, again did not reflect fair market values at the time of petitioners' after-hours trades and were neither the product of an economically adversarial nor tax-consequence adversarial bargain. Consequently, we are not compelled to accept them for tax purposes.

In substance, on August 9, just as on August 7, petitioners exchanged futures contracts in March 1974 silver and December 1974 silver for an equal number of May 1974 and

---

[21]For the calculation of these figures, see note 20 *supra*.

September 1974 silver futures contracts plus boot. This exchange of contracts must be treated as a taxable one.[22] Section 1001(b) provides: "The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received." See also sec. 1.1001–1(a), Income Tax Regs. Accordingly, petitioners must be said to have realized in exchange for their March 1974 and December 1974 futures contracts, the fair market value of the long May 1974 and long September 1974 contracts and the amount of money they received on August 9. Using settlement prices as a measure of fair market value, both Smith and the Jacobsons each realized a total of $1,249,920, composed of $616,560 attributable to the fair market value of 21 contracts of May 1974 silver, $630,000 attributable to the fair market value of 21 contracts of September 1974 silver, and $3,360 of money received in the course of the trade.

Having thus determined (1) the units of property acquired, (2) the events closing the transactions, (3) the bases of the property, and (4) the amounts realized, we can now compute petitioners' actual losses in 1973. On August 7, 1973, Smith and the Jacobsons each acquired long March 1974 and long December 1974 silver positions with respective aggregate bases of $1,254,330.[23] On August 9, they closed these positions, receiving in exchange therefor money and property worth $1,249,920. Further, each account was charged $1,344 in commission costs for the completed "round turns" on that date.[24] Accordingly, petitioners' actual losses amounted to

---

[22]Again, we note respondent makes no argument that sec. 1031 is applicable here, and we express no opinion on that subject.

[23]See note 20 *supra*, for the computation of this figure.

[24]These commission costs are capital in nature and would provide additional capital losses if the underlying losses themselves were deductible. *Battelle v. Commissioner*, 47 B.T.A. 117, 128 (1942); *Jordan v. United States*, 344 F. Supp. 87, 89 (W.D. Ark. 1972). But see *Covington v. Commissioner*, 42 B.T.A. 601 (1940), revd. on this issue 120 F.2d 768, 770 (5th Cir. 1941).

$5,754[25] in each trading account, rather than the $95,424 in each account which petitioners claim.[26]

---

[25]($1,254,330 - $1,249,920) + $1,344 = $5,754

[26]A corollary of our holding that petitioners did not experience actual losses of $95,424 in each account on Aug. 9, 1973, is that petitioners likewise did not realize a gain of $90,342 in each account on the closing out of all their commodities positions on Feb. 13, 1974. The latter figure was the net gain O'Hare computed after calculating that petitioners in each account realized a long-term capital gain of $974,526 on disposing of their long May 1974 and long September 1974 silver positions on Feb. 13, 1974, and realized a short-term capital loss of $884,184 on disposing of their short July 1974 silver positions.

O'Hare's calculations were based, at least in part, on the erroneous assumptions regarding basis and amount realized which we have already detailed. In actuality, petitioners realized gains and losses on Feb. 13, 1974, in the following amounts:

The 21 long May 1974 and 21 long September 1974 positions in each account were acquired in the course of simultaneous straddle trades after the close of the regular trading session Aug. 9, 1973. Their bases, therefore, are their fair market values, and those values are calculated by using settlement prices. The bases in the long May 1974 and long September 1974 positions were $1,246,560 in each account, $616,560 for the 21 May 1974 contracts in each account (21 × 293.60 (the settlement price) × 10,000), and $630,000 for the 21 September 1974 contracts in each account (21 × 300.00 (the settlement price) × 10,000).

These positions in May 1974 and September 1974 contracts were closed out when they were exchanged in a simultaneous straddle transaction on Feb. 13, 1974, for contracts in July 1974 silver—i.e., when petitioners purchased May 1974/July 1974 straddles and sold July 1974/September 1974 straddles on that date. There is no evidence in the record that these Feb. 13, 1974, straddles were not traded at fair market values or that they were traded after the close of the regular trading session that day. Consequently, for purposes of calculating gain and loss, we assume petitioners' Feb. 13, 1974, prices represent fair market values. The amount realized on closing out the long May 1974 and long September 1974 positions is the fair market value of the long July 1974 contracts received in the exchange, less boot paid and less commissions. Petitioners realized $2,169,216 in each account, consisting of $2,171,400 realized on receiving 21 July 1974 contracts with a fair market value of 516.50 cents per ounce and 21 July 1974 contracts with a fair market value of 517.50 cents per ounce, $840 paid out to reflect spread differentials of 1.8 cents per ounce paid for the May 1974/July 1974 straddles, and 1.4 cents per ounce received on the July 1974/ September 1974 straddles (or a net of 0.40 cents on 21 butterfly straddles = $840), and $1,344 of commissions paid for "round turns" in the May 1974 and September 1974 positions.

Petitioners, therefore, realized long-term capital gains of $922,656 ($2,169,216 - $1,246,560) in each account attributable to closing their May 1974 and September 1974 positions on Feb. 13, 1974. See sec. 1233.

In regard to the loss on the short July 1974 legs, petitioners acquired long positions in July 1974 silver contracts on Feb. 13, 1974, in the course of the straddle trades described above. These long positions in July 1974 silver were then promptly used to close out petitioners' short positions in those futures acquired Aug. 7, 1973. Petitioners' bases in the long positions in July 1974 silver acquired Feb. 13, 1974, were the fair market values of those contracts on Feb. 13, 1974. Using petitioners' prices on Feb. 13, 1974, as fair market values (for reasons given above), petitioners' bases in the July 1974 contracts in each account were $2,171,400 (21 July 1974 contracts at 516.50 cents per ounce and 21 July 1974 contracts at 517.50 cents per ounce).

The amounts realized on the short sales of July 1974 contracts on Aug. 7, 1973, are determined by the fair market values (here measured by settlement prices) of the March 1974 and December 1974 contracts, less boot paid and less commissions, received in exchange for July 1974 contracts in an after-hours straddle trade on Aug. 7, 1973.

These $5,754 losses were real, not shams.[27] They were the product of commodity trading actually engaged in pursuant to COMEX rules during the straddle trading sessions on August 7 and 9. The contracts traded were legally binding on the parties under the rules of the COMEX; if petitioners had not, through later independent trades, closed out their August 7 positions, delivery rights and obligations respecting the underlying commodity, silver, would have ensued. Such losses may not be disallowed on the grounds of sham. *Maloney v. Commissioner, supra* at 1228.

## Must the Losses Be Integrated?

In Rev. Rul. 77–185, 1977–1 C.B. 48, respondent first took the position that first-year losses in a commodity tax straddle should be integrated with second-year gains and recognized, if at all, only in the second year. He pursues this argument here. Respondent asserts that petitioners' scheme of maintaining a balanced position in long and short silver futures merely to stagger economically offsetting gains and losses in different years should be subjected to the step transaction doctrine, with gain or loss recognizable, if at all, at the close of the scheme.

Amicus points out that if we were to accept respondent's argument, we would be essentially writing a wash sale provision into the Code for straddle trading. Amicus notes that a number of courts, including this one, have held that

---

Petitioners realized $1,249,416 in each account on Aug. 7, 1973, for their short sales of July 1974 contracts, composed of $611,520 realized on receiving 21 March 1974 contracts with a fair market value of 291.20 cents per ounce, $642,810 realized on receiving 21 December 1974 contracts with a fair market value of 306.10 cents per ounce, $3,570 of boot paid (see note 20 *supra*, for calculation), and $1,344 of "round-turn" commissions (charged to petitioners on Feb. 13, 1974, for closing out the July 1974 positions).

Petitioners, therefore, realized short-term capital losses of $921,984 ($2,171,400 - $1,249,416) in each account attributable to closing their July 1974 positions on Feb. 13, 1974. See sec. 1233(b) and (d).

With long-term gains of $922,656 and short-term losses of $921,984, petitioners actually realized a net gain of $672 on Feb. 13, 1974.

This $672, it should be noted, when combined with petitioners' actual losses of $5,754 in 1973 in each account, produces a net loss of $5,082 on the entire commodity tax straddle—the exact figure O'Hare ultimately reached using his artificial prices. It is obvious, therefore, that our treatment of simultaneous straddle trades as exchanges has no practical effect on economic, as opposed to tax, consequences for commodity traders.

[27]Contrast *United States v. Winograd, supra*, and *United States v. Turkish, supra*, discussed in note 4 *supra*.

commodity futures do not constitute stock or securities within the meaning of the wash sale provisions of the Code—currently section 1091. *Corn Products Refining Co. v. Commissioner*, 215 F.2d 513, 516–517 (2d Cir. 1954), affg. on this issue 16 T.C. 395 (1951), affd. on another ground 350 U.S. 46 (1955); *Sicanoff Vegetable Oil Corp. v. Commissioner*, 27 T.C. 1056, 1066 (1957), revd. on other grounds 251 F.2d 764 (7th Cir. 1958). Contra *Trenton Cotton Oil Co. v. Commissioner*, 147 F.2d 33, 36–37 (6th Cir. 1945), revg. and remanding a Memorandum Opinion of this Court, rehearing denied 148 F.2d 208 (6th Cir. 1945). Respondent, himself, in each of the above cases argued that the wash sale provisions were inapplicable to commodities futures. He restated this position in Rev. Rul. 71–568, 1971–2 C.B. 312. We think the above cases provide sufficient authority for the proposition that section 1091 has no application to the field of commodities futures trading.[28]

Additionally, we think these cases, coupled with cases such as *Valley Waste Mills v. Page, supra,* and *Harriss v. Commissioner, supra,* indicate that at least in the situation of switches in the course of an attempt to maintain a continuous outright long or short position in futures of a particular commodity, no "common law" wash sale doctrine should apply.

The question we are faced with, then, is whether switches in the course of an attempt to maintain a continuous *straddle* position are, or should be, subject to any such common law wash sale doctrine.

Respondent argues there is a substantial difference between a switch in an outright position and a switch in a straddle position. In a switch in an outright position, the gain or loss that accrues to a taxpayer's commodity account is available for withdrawal or required to be made up by the taxpayer at the

---

[28]The inapplicability of sec. 1091 to commodity straddles was recognized by drafters of the Economic Recovery Tax Act of 1981. See S. Rept. 97–144, at 145, 148–149 (1981), 1981–38 I.R.B. 108, 163, 165. To remedy this apparent defect, subsec. (b) of sec. 1092, the new straddle provision, provides:

(b) CHARACTER OF GAIN OR LOSS; WASH SALES.—Under regulations prescribed by the Secretary, in the case of gain or loss with respect to any position of a straddle, rules which are similar to the rules of subsections (a) and (d) of section 1091 and of subsections (b) and (d) of section 1233 and which are consistent with the purposes of this section shall apply.

Economic Recovery Tax Act of 1981, Pub. L. 97–34, sec. 501, 95 Stat. 323, 324. This new provision is not applicable to the transactions here under scrutiny. Economic Recovery Tax Act, *supra* at sec. 508.

time of the switch. In a switch in a straddle position, conversely, gain or loss on the switch of one of the legs of the straddle usually cannot be withdrawn or need not be made up at the time of the switch: if the switch produces a loss, the loss is usually covered by an approximately equal unrealized gain in the other leg and no margin call results; if a gain is produced, the gain usually cannot be withdrawn because of a roughly corresponding deficit in the equity of the leg remaining in the account.

While respondent is deeply troubled by the use of unrealized gain to offset realized losses, we do not think this a sufficiently grave reason to integrate and postpone the recognition of such losses. It is well-settled tax law that a taxpayer may borrow out the unrealized gain inherent in an asset and use the proceeds for any purpose he likes without triggering a sale of the underlying asset. *Woodsam Associates, Inc. v. Commissioner*, 16 T.C. 649 (1951), affd. 198 F.2d 357 (2d Cir. 1952); *Lutz & Schramm Co. v. Commissioner*, 1 T.C. 682, 688–689 (1943). As we view the facts, petitioners here merely borrowed against the unrealized gain (i.e., the increased equity) in their short July 1974 positions on August 9 and applied the proceeds to pay their broker for the realized losses in the closed-out March 1974 and December 1974 long positions.

Respondent's real, if obliquely articulated, objection, it seems to us, is that it is unfair to let petitioners recognize their losses because they knew ahead of time that there would likely be sufficient unrealized gain in their short July 1974 legs to borrow against so that they would not have to suffer any economic discomfiture on the switch. We might be more sympathetic with respondent's argument if in fact petitioners were guaranteed to have an exact offsetting unrealized gain available on August 9. However, here, they were not so assured. Contracts in different delivery months could, and in fact, did, show varying relative prices during the course of petitioners' straddles trades. While the actual pricing differences may have been small considering the size of petitioners' investments, we are not prepared to say such differences were de minimis. For us to draw a line, here, by saying that investments in these different assets must be integrated for tax purposes because their prices travel too much in tandem, simply begs the question: How nearly parallel is too nearly

parallel? If platinum and gold futures prices travel roughly in tandem, are we to integrate a straddle in opposing platinum and gold futures? If the prices of certain utility stocks travel in a parallel fashion, are we to integrate a long position in utility A stock with a short position in utility B stock? A little reflection shows that straddles may be maintained in almost anything.

The complexity of enunciating a theory defining which investments are too nearly parallel is demonstrated by section 1092, added to the Code by the Economic Recovery Tax Act of 1981, Pub. L. 97–34, sec. 501, 95 Stat. 323. Section 1092 sets up various rebuttable presumptions regarding what positions are "offsetting" for purposes of applying the new straddle provisions. Section 1092(c)(3)(A) states five statutorily defined factors which indicate a straddle in offsetting positions and authorizes the Secretary to promulgate regulations naming further factors (and thereby creating further rebuttable presumptions) which indicate offsetting positions. We do not believe it is within the province of this Court to attempt to draft our own novel straddle integration provision.

We conclude that in the instant case both a nonstatutory wash sale doctrine and the step transaction doctrine are inappropriate to achieve respondent's result. In the past, nonstatutory wash sale consequences have resulted in cases where a party has failed to completely relinquish an economic investment in the same or a substantially identical asset. *McWilliams v. Commissioner*, 331 U.S. 694 (1947); *Horne v. Commissioner*, 5 T.C. 250 (1945). In the instant case, after the switch, petitioners were not holding the same assets, March 1974 and December 1974 futures, but were instead holding May 1974 and September 1974 futures. These new positions were not substantially identical assets for purposes of the statutory wash sale provision (*Corn Products Refining Co. v. Commissioner, supra*, 16 T.C. at 399–400, affd. on this issue 215 F.2d at 516–517), nor were they substantially identical for any other wash sale approach. *Harriss v. Commissioner, supra; Valley Waste Mills v. Page, supra*. We fail to see how the mere simultaneous holding of a short July 1974 position throughout this period changes the result.[29] Accordingly, a nonstatutory

---

[29]No different result would occur if we considered the property held prior to Aug. 9 as March 1974/July 1974/December 1974 straddles, and the property held after that date as

wash sale approach does not require the integration of petitioners' losses.

The step transaction doctrine generally applies in cases where a taxpayer seeks to get from point A to point D and does so stopping in between at points B and C. The whole purpose of the unnecessary stops is to achieve tax consequences differing from those which a direct path from A to D would have produced. In such a situation, courts are not bound by the twisted path taken by the taxpayer, and the intervening stops may be disregarded or rearranged. See *Gregory v. Helvering*, 293 U.S. 465 (1935).

In the instant case, petitioners sought to get from a position where they had significant short-term capital gains in year one to a position where they had long-term capital gains of roughly the same amount in year two. To aid them in their quest, they acquired certain property and engaged in certain transactions with that property and other property. Losses were produced in year one, and gains were produced in year two, thus achieving at least their goal of deferral.

The above description of what petitioners did is the very essence of the typical tax shelter investment where losses in the early years are eventually offset by gains in future years. Respondent has not pointed us to any court decision which to this date has held that the step transaction doctrine requires that gains and losses in a tax sheltering investment spanning the course of more than 1 taxable year must be integrated and recognized only at the termination of such an investment 2, 5, or 20 years down the road. Indeed, such an argument would go far toward undermining the very system of annual tax accounting.

Respondent's argument also fails to recognize that there is some risk that the future offsetting gains might never occur (a

---

May 1974/July 1974/September 1974 straddles. Respondent has frequently asserted that the characteristics of these two butterfly spreads are not the same, that the latter straddles are ones presenting less risk of gain or loss than the former due to the smaller time intervals between the delivery months employed and the greater degree of "balance." In light of respondent's argument, we think it also clear that viewed as butterfly straddle units, petitioners' investments before and after Aug. 9 were not in substantially identical property within the meaning of the statutory wash sale provision or any nonstatutory wash sale approach.

conceivable, though not probable, result in the instant case). Accordingly, we view petitioners' straddle transactions as being distinguishable from the situations where courts have previously applied the step transaction doctrine, most notably in the taxation of transactions between corporations and stockholders. See, e.g., *Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945); *Gregory v. Helvering, supra*. See also B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 14.51, at 14–130 to 14–132 (4th ed. 1979).

In sum, we conclude prior case law and statutes do not require the integration of petitioners' August 9 straddle losses.

## Section 165(c)(2)

Respondent next argues that even if petitioners incurred real, measurable losses in 1973, such losses are not allowable because they were not "incurred in any transaction entered into for profit" within the meaning of section 165(c)(2).[30]

For purposes of applying section 165(c)(2), respondent has treated the relevant "transaction" as an investment in a "commodity tax straddle," while petitioners have on the whole treated the transaction as an investment in butterfly straddles. This distinction is an important one and goes far toward explaining the different conclusions reached by petitioners' and respondent's experts as to the potential historical profitability of petitioners' investments. Petitioners' expert demonstrated that historically an investment in a silver butterfly straddle potentially could have resulted in a profit exceeding commission costs if the right straddle and right date to get out of the straddle were chosen. Respondent's expert, on the other hand, demonstrated that an investor acquiring a silver butterfly straddle position during the latter half of the taxable year, holding it until a particular tax loss was achieved, and then switching position into a new butterfly straddle to be held for 6 months and then liquidated, was much less likely to achieve a profit. We agree with respondent that what petitioners invested in with Merrill Lynch were commodity tax straddles—i.e., a prearranged, planned sequence of trading along the lines

---

[30]Petitioners make no argument that their futures trading activity constituted a trade or business.

studied by respondent's expert—not simple investments in butterfly straddles held solely for nontax profit objectives. For purposes of section 165(c)(2), then, we hold the relevant "transaction" to encompass petitioners' entire commodity tax straddle scheme.[31]

The mere fact that petitioners may have had a strong tax-avoidance purpose in entering into their commodity tax straddles does not in itself result in the disallowance of petitioners' losses under section 165(c)(2), provided petitioners also had a nontax profit motive for their investments at the time. See *Knetsch v. United States*, 172 Ct. Cl. 378, 348 F.2d 932, 936–937 (1965). Such hope of deriving an economic profit aside from the tax benefits need not be reasonable so long as it is bona fide. See *Bessenyey v. Commissioner*, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967). However, the existence of a nontax profit objective is a question of fact on which the petitioners bear the burden of proof. *Knetsch v. United States, supra*; Rule 142(a), Tax Court Rules of Practice and Procedure. In ascertaining petitioners' subjective intent, this Court is not bound by the taxpayer's uncontradicted assertions of proper motive made 8 years after the events in issue. See, e.g., *Fleischer v. Commissioner*, 403 F.2d 403, 406 (2d Cir. 1968), affg. a Memorandum Opinion of this Court; *Dougherty v. Commissioner*, 60 T.C. 917, 932–933 (1973).

Contemporaneous evidence, we think, belies any nontax motive on petitioners' part. First, it is clear that petitioners were solicited for these investments solely because they possessed large short-term capital gains which these investments could defer. Merrill Lynch did not solicit clients for

---

[31]In any event, petitioners would not necessarily benefit from our consideration of the transaction as an investment in butterfly straddles. If the butterfly straddles acquired on Aug. 7 were treated as indivisible units for purposes of sec. 165(c)(2), we think petitioners' closing out of these straddles and incurring a $1,344 commission charge in each account 2 days after initial acquisition without any apparent change in market news (insofar as O'Hare's testimony or other evidence reveals) indicates that from the beginning, petitioners were not intending to hold their Aug. 7 butterfly straddles for economic profit (i.e., for profit from difference gains). If, on the other hand, petitioners' transactions were treated as separate acquisitions of March 1974, July 1974, and December 1974 positions for purposes of sec. 165(c)(2), petitioners' profit arguments would seem to be even less convincing. The long March 1974 and long December 1974 positions, acquired on Aug. 7 and closed out at a loss on Aug. 9, were bought, according to petitioners, at prices which we have found far exceeded their fair market values at the moment of purchase. They were sold 2 days later at prices far below their fair market values on that date. This hardly appears to be profit-motivated conduct with respect to the individual March 1974 and December 1974 legs.

these investments who could not take advantage of the tax consequences. To us, this indicates that Merrill Lynch did not view the potential nontax benefits of such an investment large enough on their own to justify the cost. In light of Merrill Lynch's own doubts about the nontax benefits, we think it unlikely that Merrill Lynch stressed these benefits (or, more accurately, lack of benefits) to petitioners.

Indeed, information (discussed subsequently) which was made available to petitioners at the time of their investments[32] indicated that there was no probability of earning an economic profit on their investments. Such information is a strong factor to consider in evaluating a taxpayer's subjective profit intent. *Brown v. United States*, 184 Ct. Cl. 410, 396 F.2d 459, 466 (1968).[33]

Jacobson achieved his albeit limited understanding of the nature of a commodity tax straddle from the meeting with Schmidt held at the offices of Sussman, Jacobson's accountant. Jacobson, according to Schmidt, was concerned primarily with how much he was at economic risk of losing, not gaining, in a commodity tax straddle; not counting commissions, Schmidt recalled quoting Jacobson a figure of approximately 25 percent of margin. Jacobson then inquired whether that meant he could also make a gain of 25 percent of margin. Schmidt said, "yes." Schmidt also briefly discussed commission costs, giving the impression that they would not be excessive. Schmidt and Jacobson admitted that the roughly $4,000 of commission costs Jacobson ultimately paid was "consistent" with what was discussed at the meeting. Taking the figure of potential profit, 25 percent of $12,000 initial margin, or $3,000, and subtracting the $4,000 of estimated commissions, Jacobson was put on

---

[32]The parties to the instant case expended great amounts of time and, no doubt, great amounts of money in producing expert statistical reports attempting to show by hindsight whether petitioners' transactions had profit potential, notwithstanding the Court's expressions of doubt as to the value of such reports at the time of the trial. The test under sec. 165(c)(2), however, is one of subjective intent at the time the transactions are entered into, not objective hindsight. *King v. United States*, 545 F.2d 700, 709 (10th Cir. 1976). Petitioners were unaware of any studies showing that tax straddles could or could not have profit potential at the time they entered into these transactions. They certainly were unaware of any reports based on price movements yet to occur. Consequently, we regrettably conclude that the parties' statistical studies were a waste of energy as regards the issue presented under sec. 165(c)(2).

[33]See also *Ginsburg v. Commissioner*, T.C. Memo. 1976–199.

notice that Merrill Lynch estimated his "best case" net economic profit in this investment to in fact be a loss of $1,000.[34] Jacobson's subsequent investment in the tax straddle in light of the information he possessed (not to mention his primary preoccupation with economic losses at the meeting) is, we think, strong evidence of a lack of any economic profit objective on his part. See *Weir v. Commissioner*, 109 F.2d 996, 997–998 (3d Cir. 1940).

Mrs. Jacobson was also present at the meeting and her name appears on the Merrill Lynch account forms. However, it is apparent Mrs. Jacobson had little input into the investment decision. Mrs. Jacobson did not testify at trial. No other evidence was adduced to show Mrs. Jacobson's subjective intent. Accordingly, petitioners have failed to meet their burden of showing Mrs. Jacobson to have had the requisite profit intent within the meaning of section 165(c)(2). Rule 142(a), Tax Court Rules of Practice and Procedure.

Smith acquired his knowledge of the risks of a tax straddle from both Jacobson and Schmidt. In a brief telephone conversation, Schmidt repeated to Smith the substance of what he had told Jacobson. These facts, we believe, also point to a lack of a nontax profit objective on the part of Smith.

Secondly, petitioners have failed to introduce any contemporaneous documents showing anything but tax objectives in their straddle investments. Notes of a telephone conversation between Smith and his accountant only refer to the tax benefits of the investment he planned. Both Smith's and the Jacobsons' "New Account Information for Commodity Speculative Accounts" forms indicate their investments to be $85,000 tax straddles through New York. So-called holding pages kept by O'Hare's tax straddle department contain the words "Objective *85M*," which, as interpreted by O'Hare, meant an $85,000 short-term capital loss in the first year was desired. Finally, O'Hare's letters to Schmidt at the conclusion

---

[34]This estimate of no economic profit on the tax straddle by Schmidt was consistent with figures O'Hare had presented at the Merrill Lynch tax straddle department seminar which Shelley had attended. At that seminar, O'Hare had said that customers should be prepared for difference losses of 10 percent of "money moved" (i.e., short-term capital gains deferred) and commission costs of a like amount. Assuming the risk of difference losses to be the risk of difference gains, therefore, at best, under O'Hare's figures, a tax straddle customer could hope to break even economically.

of the straddles note the $5,082 of economic losses (difference losses and commission costs) and yet still term the transactions "very satisfactory," as losses ran only approximately 5½ percent of the amount of money moved. (Jacobson admitted at trial that he never later complained to O'Hare or Schmidt about these economic losses.)

The only evidence introduced by petitioners to support their contention that they possessed nontax profit objectives in 1973 is their own, uncorroborated testimony which we are inclined to find of no probative value.

In light of the above facts, we find that petitioners lacked the requisite economic profit objective necessary to enable them to deduct their commodity tax straddle losses in 1973. Sec. 165(c)(2).

### Economic Recovery Tax Act of 1981

Petitioners and amicus' final argument is that Congress' closing of the tax straddle "loophole" in 1981[35] indicates that Congress felt that that loophole was open and available to be used by petitioners in 1973. To buttress this argument, petitioners and amicus point out that the Economic Recovery Tax Act of 1981 (hereinafter new act) contains a transitional relief provision, section 509, for applying the new act's other straddle provisions. Under this section, taxpayers may elect to "mark their futures to market" for the entire 1981 tax year as if 1982 rates were in effect. Tax due on gains rolled forward from prior years into 1981 may be paid in five annual installments with interest. The first installment is due with the taxpayer's 1981 taxes. H. Rept. 97–215 (Conf.) (1981) at 258.

Notwithstanding this relatively novel relief provision, providing in the opinion of Senator Dole "a new income averaging rule for those who were avoiding tax," 127 Cong. Rec. S8267 (daily ed. July 23, 1981), we think it clear that Congress in passing the new act did not intend to influence the resolution of the issues in this case. Throughout the consideration of the new act, constant reference was made to the fact that the Internal Revenue Service disputed the tax benefits claimed by

---

[35]See Economic Recovery Tax Act of 1981, Pub. L. 97–34, secs. 501–509, 95 Stat. 323–335.

pre-1981 tax straddlers. See, e.g., S. Rept. 97–144, at 145 (1981); H. Rept. 97–215 (Conf.), *supra* at 258. Tax benefits from pre-1981 tax straddles were referred to only as "allegedly available" in the Senate Finance Committee report, S. Rept. 97–144, *supra* at 146–147. In committee prints prepared by the Joint Committee on Taxation to explain the proposed Senate and House of Representatives versions of the new tax straddle legislation, specific references were made to the instant cases, both by name and Tax Court docket number. See Joint Comm. on Taxation, Background on Commodity Tax Straddles and Explanation of S. 626, at vii, 13 (Comm. Print June 11, 1981); Joint Comm. on Taxation, Background on Commodity Tax Straddles and Explanation of H. R. 1293, at 2, 14 (Comm. Print Apr. 28, 1981). Rarely can a court be as certain as we are here that the provisions of a new law were not to affect the case before it.

In addition, there is no evidence whatsoever that Congress sought to retroactively modify the longstanding principles of how gain and loss are computed or how losses under section 165(c)(2) are deducted.

Consequently, we reject petitioners' attempt to justify their loss deductions on the basis of congressional actions occurring 8 years later.

As a result of computational issues raised by the petitioners in their respective petitions,

*Decisions will be entered under Rule 155.*

Reviewed by the Court.