*Decisions will be entered under Rule 50.*

E. G. Rodman and Fay L. Rodman, Petitioners *v.* Commissioner of Internal Revenue, Respondent

Docket No. 5251–69.   Filed October 21, 1971.

*Brooks L. Harman*, for the petitioners.
*John W. Dierker*, for the respondent.

Irwin, *Judge:* Respondent determined the following deficiencies in petitioners' income tax :

| Year | Deficiency |
| --- | --- |
| 1966 | $320, 474. 65 |
| 1967 | 5, 104. 13 |

Subsequent to the trial of this case the parties settled several issues concerning petitioner's business expenses; however, two issues remain

for decision: (1) Whether petitioner understated the amount of gain realized upon a sale of oil properties in 1966; and (2) whether petitioner received a constructive dividend when he purchased property from his wholly owned corporation in 1966.

Some of the facts have been stipulated. The stipulation along with the exhibits attached thereto are incorporated herein by this reference.

Petitioners are E. G. and Fay L. Rodman, husband and wife, who at all relevant times have resided at Odessa, Tex. Petitioners filed their joint income tax returns for 1966 and 1967 with the district director of internal revenue, Dallas, Tex. Hereafter, petitioner and Rodman will be used to refer to E. G. Rodman.

Petitioner was in 1966 an independent oil operator owning both producing leaseholds and nonproducing leaseholds. Petitioner was the sole stockholder of Rodman Petroleum Corp. (hereafter Petroleum) and an 80-percent stockholder of Rodman Oil Co. (hereafter Oil). The remaining 20 percent of Oil was owned equally by Rodman's two children.

Reading & Bates Offshore Drilling Co. (hereafter Reading & Bates) was a publicly owned corporation which in 1966 was interested in acquiring the oil-producing properties owned individually by petitioner and those owned by Petroleum and Oil. It negotiated with petitioner during August and September 1966. At that time, the properties owned individually by Rodman were subject to liabilities of $1,500,000 and the properties held by his corporations, Petroleum and Oil, were subject to $1,150,000 of liabilities.

The transfer of all of the properties to Reading & Bates was accomplished in the following manner: On September 8, 1966, petitioner transferred his own properties to Petroleum in exchange for 1,700 shares of Petroleum's stock. These properties consisted of producing leaseholds with 1,191,111 barrels of oil reserves, nonproducing leaseholds, and producing equipment whose basis in petitioner's hands was $613,876.78. Because he was the sole shareholder of Petroleum, petitioner treated the exchange as being within the ambit of section 351; [1] however, he did recognize gain to the extent that the liabilities assumed of $1,500,000 exceeded his adjusted basis for these properties of $916,-828.82. Accordingly, petitioner reported $583,170.18[2] gain on his 1966 income tax return.

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

[2] Petitioner computed the gain incorrectly by $1; gain should have been shown as $583,171.18.

On or about September 16, 1966, petitioner together with his children entered into an agreement to exchange their stock in Petroleum and Oil for 165,000 shares of common stock of Reading & Bates. On January 20, 1967, the exchange of stock was consummated. At that time the common stock of Reading & Bates sold over the counter and such sales indicated a fair market value of $13\frac{7}{16}$ per share. The stock received by Rodman and his children represented about 10 percent of the outstanding stock of Reading & Bates, but it also was unregistered letter stock which was restricted as to transfer and sale by the Securities and Exchange Commission. After the exchange, Oil and Petroleum became and have remained subsidiaries of Reading & Bates.

The parties have agreed that petitioner treated the transaction incorrectly for tax purposes. The transfer by Rodman of the properties that he owned individually to his wholly owned corporation is to be disregarded. Petitioner is to be treated for tax purposes as if he engaged in two separated transactions: (1) a taxable sale to Reading & Bates of the properties that he owned individually, and (2) a nontaxable exchange of his stock in Petroleum and Oil for stock of Reading & Bates. The total consideration flowing from Reading & Bates, the assumption of the $1,500,000 of liabilities to which Rodman's individual properties were subject and 165,000 shares of common stock, is to be allocated between the two transactions according to fair market value.

Prior to the transfer of property to Petroleum petitioner's relevant interests appeared as follow:

Owned by Rodman:
    Producing property:
        Leaseholds and equipment with 1,191,111 barrels of reserves.
        Leasehold basis=$132,618.
        Equipment basis=613,877.
Owned by Petroleum and Oil:
    Producing property:
        Leaseholds and equipment with 2,446,851 barrels of reserves.
    Nonproducing property:
        Leaseholds with stipulated market value=$170,333.
        Leasehold basis=$170,333.
        Other assets with stipulated market value=$729,447.

In 1961, Petroleum purchased a 50-percent stock interest in the Model Shop of Odessa, a retail clothing business, for $293,802.60. Half of this interest was later sold leaving Petroleum with a 25-percent interest. Because Reading & Bates did not wish to purchase the interest in the Model Shop, petitioner purchased the stock from Petroleum for $146,901.30 in September 1966. During the period that Petroleum owned the Model Shop stock its book value increased by over $37,000; however, no dividends were ever paid on the stock, the earnings of the corporation were small, and the corporation had been required to

borrow over $300,000 for its needs for operating capital. In addition the 25-percent stock interest could exercise no control over the conduct of the corporation's business because 50 percent of the outstanding stock was owned by one man who was the sole manager of the business.

OPINION

This case presents two issues for determination: (1) Whether petitioner neglected to report all of his gain from a constructive sale of property in 1966, and (2) whether petitioner received a dividend when he purchased some stock from his wholly owned corporation.

## Gain on Sale

The facts concerning the first issue can be stated briefly. Petitioner was an independent oil operator. He owned individually many producing and nonproducing leaseholds and some oil-drilling equipment. He also owned all of the stock of Petroleum and 80 percent of the stock of Oil, each of which companies owned producing leaseholds, producing equipment, and other assets. In 1966, Reading & Bates, a publicly owned corporation, desired to acquire all of petitioner's oil-related properties. In order to accomplish the transfer in a manner acceptable to Reading & Bates, petitioner transferred all of the properties that he owned individually to Petroleum in exchange for 1,700 shares of its stock. Thereafter, in January 1967, petitioner along with the owners of the remaining 20-percent interest in Oil exchanged their stock in Petroleum and Oil for 165,000 shares of Reading & Bates stock.

Petitioner treated the transfer of property to Petroleum on his 1966 return as being nontaxable under section 351 except to the extent that gain had to be recognized under section 357(c) for liabilities assumed which were in excess of his basis in the properties. Prior to trial petitioner conceded, and the parties have stipulated that the transfer of the properties to Petroleum should be treated as if it were a taxable sale to Reading & Bates. The consideration received on this constructive sale by petitioner was the assumption of the $1,500,000 of liabilities which encumbered the property and a part of the Reading & Bates stock received ostensibly in exchange for the Oil and Petroleum stock. The treatment agreed upon accords with respondent's Rev. Rul. 70–140, 1970–1 C.B. 73.

The parties cannot agree upon the proper manner of measuring the gain on the constructive sale. Respondent contends that because the properties that petitioner owned individually became commingled with the properties owned by Petroleum and because petitioner was

not the sole recipient of Reading & Bates stock, the amount of consideration received by petitioner on the constructive sale cannot be measured. Therefore, he claims that petitioner's gain should be measured by the fair market value of the properties transferred. Respondent's single authority for this contention is the following sentence in Rev. Rul. 70–140, 1970–1 C.B. 73, dealing with the amount realized in cases analogous to the present one:

Accordingly, that portion of the stock of Y [the constructive purchaser] received by A [the seller] equal to the fair market value of the sole proprietorship assets is treated as an amount received from the sale of those assets. * * *

While in many cases it might be easier to compute the gain realized on a sale similar to the present one by reference to the fair market value of property transferred rather than to the fair market value of the consideration received, we agree with petitioner's contention that respondent's rule is opposite to the method of computing gain provided in section 1001.[3] In fact, we believe that it is well settled that the value of the property given up in an exchange is to be used as the measuring rod of gain or loss only when it is impossible to determine the value of the consideration received. *Philadelphia Park Amusement Co.* v. *United States*, 126 F. Supp. 184 (Ct. Cl. 1954); *Halsey L. Williams*, 37 T.C. 1099 (1962); *Bar L. Ranch, Inc.* v. *Phinney*, 426 F. 2d 995 (C.A. 5, 1970).

In this case, recasting the transactions into forms different from those actually pursued by the parties will make it difficult to determine the amount realized from the sale of petitioner's properties; however, the task is not impossible. We feel obligated to follow the statute where it is possible to do so. In addition, we feel compelled to try to discover the value of the consideration received because respondent's evidence concerning the fair market value of properties sold is quite flimsy.

Respondent's witness at trial was an accountant who was a partner in an accounting firm which had been employed by Reading & Bates subsequent to its acquisition of Petroleum and Oil. The gist of the accountant's testimony was that he had been required to determine the

[3] SEC. 1001. DETERMINATION OF AMOUNT OF AND RECOGNITION OF GAIN OR LOSS.

(a) COMPUTATION OF GAIN OR LOSS.—The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized.

(b) AMOUNT REALIZED.—The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received. In determining the amount realized—

(1) there shall not be taken into account any amount received as reimbursement for real property taxes which are treated under section 164(d) as imposed on the purchaser, and

(2) there shall be taken into account amounts representing real property taxes which are treated under section 164(d) as imposed on the taxpayer if such taxes are to be paid by the purchaser.

fair market values of the properties transferred by Rodman to Petroleum. He testified that the value of the producing properties was $1 per barrel of oil reserve or $1,191,111; however, he revealed that the basis for his figure was not personal knowledge of the oil business but the following:

A. Well, we requested a value from the Reading & Bates engineers of purchased reserves and we were advised of a dollar a barrel on purchased reserves and we valued reserves on that figure, a dollar a barrel.

Petitioner did not object to the admission of this testimony at trial on the ground of hearsay although he notes this on brief, and we do not venture to rule whether the testimony is objectionable on that ground. On the other hand, the testimony of the accountant was unsupported by any evidence of the manner in which the $1 per barrel figure was computed. With due respect to the presumption of correctness afforded respondent we are skeptical of this evidence as to value and accord it little weight.

Respondent's evidence concerning the fair market value of the producing equipment transferred by Rodman to Petroleum was similarly unpersuasive. The accountant testified that the figure he used for fair market value of acquired equipment was 75 percent of original cost, or about $744,000 in this case. It later developed that this figure was an industry-wide value used in joint venture agreements for equipment that is in good usable condition. Respondent applied this figure without regard to the actual age, condition, or utility of the equipment. In two instances, petitioner was able to demonstrate that the equipment that he transferred was worth considerably less than 75 percent of its original cost. The value supplied by the accountant is further suspect because it would have been greatly to Reading & Bates' advantage to overestimate the value of the depreciable equipment that it acquired.

As a part of the agreement, Reading & Bates acquired all of the properties by issuing 165,000 shares of unregistered letter common stock to petitioner and his two children. On the date of the exchange registered common stock of Reading & Bates had a fair market value of $13-7/16 per share on the basis of over-the-counter sales. Petitioner's expert witness testified that the unregistered letter stock received by petitioner was not as valuable as the shares traded over the counter. Petitioner's stock was subject to restraints imposed on its sale by the Securities and Exchange Commission, and prospective purchasers could not buy the shares on margin. Accordingly, the market for petitioner's stock would be quite limited. Petitioner's expert estimated that the value of his stock was only 60 percent of that for the traded shares of Reading & Bates, or a little over $8 per share. Al-

though the testimony of petitioner's expert is uncontradicted, we believe that he overestimated the difficulties that petitioner would have in disposing of his Reading & Bates stock and hence overestimated the discount from market price. Taking everything in the record into consideration including the strong financial condition of Reading & Bates and its record of increasing earnings during the years at issue, we hold that the value of the stock issued to petitioner was $10 per share.

In actuality, petitioner and Reading & Bates proceeded under the theory that Reading & Bates could acquire all of the Rodman properties for 165,000 shares of stock issued in a tax-free reorganization. Consequently, Reading & Bates did not in fact assume any liability to which these properties were subject; the liabilities remained the obligation of the acquired subsidiaries, Petroleum and Oil. The parties have stipulated that in part petitioner and Reading & Bates proceeded upon the wrong theory: petitioner should be taxed as if he sold the properties that he owned individually to Reading & Bates for an assumption of the $1,500,000 of liabilities to which they were subject and a part of the stock. To give effect to the stipulation we must determine what Reading & Bates would have paid for the properties that Rodman owned individually if the parties had believed the exchange to be taxable. We believe that the best way to make this determination is to determine first what Reading & Bates would have paid if it had purchased all of the properties directly from Rodman and his children. Thereafter, we shall apportion this purchase price between the properties that Rodman owned and those held by Petroleum and Oil. Accordingly, Reading & Bates will be deemed to have paid part of the stock and assumed the $1,150,000 of liabilities to which the Petroleum and Oil properties were subject. Therefore, we conclude that the total consideration deemed paid by Reading & Bates to acquire all of the Rodman properties is $4,300,000 computed in the following manner:

| | |
|---|---|
| 165,000 Reading & Bates shares at $10 | $1,650,000 |
| Liabilities of petitioner assumed | 1,500,000 |
| Liabilities of Petroleum and Oil assumed | 1,150,000 |
| Total consideration | 4,300,000 |

Reading & Bates received producing property with 1,191,111 barrels of oil reserves and nonproducing property from petitioner. It also received producing property with 2,446,851 barrels of oil reserves and other assets whose value has been stipulated to be $729,447 from Petroleum and Oil. The nonproducing property received from petitioner has an agreed upon value of $170,333 which is also its basis. Accordingly,

the net cost to Reading & Bates was $3,400,220 for all of the producing properties (leaseholds and equipment) that it received as follows:

| | |
|---|---:|
| Total paid | $4, 300, 000 |
| For other assets received from Oil and Petroleum | (729, 447) |
| For nonproducing Rodman properties | (170, 333) |
| Amount paid for producing property and equipment | 3, 400, 220 |

The reserves constructively sold by petitioner represented 32.7 percent (1,191,111/3,637,962) of the total received by Reading & Bates. Hence, $1,111,872 of the amount paid for producing property should be allocated to the leaseholds and equipment sold by petitioner. As this amount plus the $170,333 paid for the nonproducing leaseholds is less than the $1,500,000 of liabilities assumed with respect to the properties formerly owned by petitioner, we hold that petitioner realized $1,500,000 on the sale of these properties. This result comports with petitioner's credible testimony that he was merely trying to get out from under his liabilities on his properties in arranging the transaction with Reading & Bates.

The $1,500,000 consideration must be further allocated between the leaseholds and the producing equipment in order to determine whether petitioner realized any ordinary income subject to recapture under section 1245 on the sale of the equipment. As we noted previously, respondent's witness valued the producing equipment received from petitioner at 75 percent of its original cost, or at about $744,000.[4] We do not believe this figure to be realistic in light of the discrepancies that petitioner was able to demonstrate in two instances and of the fact that Reading & Bates entered into the transaction not to purchase equipment but to obtain oil reserves. Petitioner's adjusted basis for the equipment was $613,876, or about 62 percent of original cost. We believe on the record in this case that the fair market value of the equipment could not be greater than petitioner's adjusted basis. Therefore, all of petitioner's gain on the sale is attributable to the producing leaseholds.

---

[4] Alternatively respondent argues that the value of the producing equipment is $838,145. This figure was computed in the following manner: The accounting firm employed by Reading & Bates after the acquisition of Petroleum and Oil estimated the fair market value of the properties transferred by Rodman to Petroleum, approximately $1,191,000 for the producing leaseholds, and $744,000 for the producing equipment. Using these figures to arrive at the proper allocation, the accountant added $224,268 of Rodman's reported gain of $583,170 to Rodman's basis for the equipment. The obvious purpose of this computation was to determine Petroleum's basis for the properties received from Rodman under sec. 362(a) on the assumption that a valid sec. 351 exchange had occurred. Respondent argues that $838,145 is the proper fair market value "to be consistent." We fail to see the relevance of the basis assigned to the equipment by Petroleum to the issue of the fair market value of the equipment except for the fact that $838,145 represents the largest figure found anywhere on respondent's exhibits.

## Constructive Dividend

In 1961, Petroleum purchased a 50-percent stock interest in the Model Shop of Odessa, a retail clothing concern, for $293,802.60. Half of this interest was later sold, leaving Petroleum with a 25-percent interest. The purpose of the purchase was to provide the Model Shop with the additional funds that it needed in order to open up a new store in vacant space in a building owned by petitioner. As a condition of entering into the transaction with Reading & Bates petitioner was required to purchase Petroleum's 25-percent interest in the Model Shop stock. In September 1966 petitioner acquired the stock from Petroleum for $146,901.30, the exact same amount that had been paid 5 years previously to acquire 25 percent of the stock.

The parties agree that if petitioner acquired the Model Shop stock in a bargain purchase from his corporation, the difference between the fair market value of the stock at the time of the purchase and the amount paid represents a dividend to petitioner from Petroleum. See *Estate of William D. Mundy*, 36 T.C. 703 (1961), and *Lester E. Dellinger*, 32 T.C. 1178 (1959). Respondent bases his determination of a constructive dividend on the fact that the book value of the stock increased by about $37,000 during the time that Petroleum owned it. In addition, respondent has pointed out that the net worth of the Model Shop increased over $100,000 during the period and that the book value assigned the stock by Petroleum did not include any element of goodwill.

Petitioner insists that we look at other factors in addition to book value in determining the fair market value of such an asset. We agree. During the period that Petroleum owned the Model Shop stock no dividends were paid, the business had a low rate of profit on sales, and its net income from sales declined. The business had been required to borrow heavily from petitioner, its other shareholders, and a bank in order to meet its needs for operating capital. More importantly, the stock interest purchased by petitioner had no voice in the management of the business because the man who had been the sole owner of the Model Shop prior to 1961 was still able to exert complete control over the business although owning only 50 percent of the stock in 1966. In view of the adverse factors shown by petitioner we do not believe that an arm's-length purchaser of the Model Shop stock would have paid more for it than he did. Therefore, we hold that the price petitioner paid for the Model Shop stock was not less than its fair market value and that the purchase did not generate any dividend income. In view of the foregoing and of the fact that concessions made by both parties will require further computation,

*Decision will be entered under Rule 50.*