METRO AUTO AUCTION OF KANSAS CITY, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Metro Auto Auction, Inc. v. Commissioner
Docket No. 3251-80.
United States Tax Court
T.C. Memo 1984-440; 1984 Tax Ct. Memo LEXIS 238; 48 T.C.M. (CCH) 894; T.C.M. (RIA) 84440; August 14, 1984. Thomas E. King,Thomas E. Carew and David R. Burford, for the petitioner. Robert M. Fowler, for the respondent. SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION SWIFT, Judge: Respondent determined deficiencies in petitioner's *239 Federal income tax for 1975 and 1976 in the amounts of $7,367 and $32,005, respectively. After concessions by petitioner, the issues for decision concern (1) the allocation of petitioner's cost basis in stock it owned in a subsidiary corporation to the various assets of that subsidiary corporation upon liquidation of the subsidiary into petitioner and (2) whether any of the assets in question qualify for amortization deductions. This case was stipulated in part, and the stipulation of facts is incorporated herein. Trial was held in Kansas City, Missouri, on October 25 and 26, 1983. FINDINGS OF FACT Petitioner, Metro Auto Auction of Kansas City, Inc., was a Missouri corporation doing business in Kansas City, Missouri, at the time it filed its petition herein. Petitioner timely filed its Federal corporate income tax returns for 1975 and 1976. Wil-Ray Auto Auction, Inc. (hereinafter referred to as "Wil-Ray"), a Missouri corporation wholly owned by Willie White, operated an auto auction in Kansas City, Missouri, from 1965 until December, 1974. During the years 1970 through 1973, Wil-Ray had gross sales ranging from $306,000 to $333,000. On June 28, 1974, petitioner purchased *240 3,672 shares of the common stock of Wil-Ray from Willie White for $85,000. On July 2, 1974, Wil-Ray redeemed the remaining shares of common stock owned by Willie White, leaving petitioner as the sole shareholder of Wil-Ray. On December 31, 1974, Wil-Ray was liquidated into petitioner pursuant to sections 332 and 334(b)(2). [1] As of that date, petitioner's basis of $85,000 in the stock of Wil-Ray was allocated by petitioner to the following assets received by petitioner in the liquidation of Wil-Ray: Tangible Assets
$ 2,000
Leasehold Interest
50,000
Customer Card File
23,000
Goodwill
10,000
Total
$85,000
Respondent, upon audit, reallocated petitioner's $85,000 cost basis. Respondent allocated $2,000 to the tangible assets, no amount to the leasehold interest, no amount to the customer card file, and the balance of $83,000 to goodwill. Since the parties agree that $2,000 was properly allocated to the tangible assets of Wil-Ray, such allocation is not in issue. The parties further agree that the only *241 three assets among which the remaining $83,000 could arguably be allocated are the leasehold interest, the customer card file, and goodwill. We will first set forth the pertinent facts with respect to the leasehold interest, followed by a discussion of the facts regarding the customer card file and goodwill. As part of the liquidating distribution of Wil-Ray, petitioner acquired a lease between Wil-Ray, as lessee, and the Troost Avenue Development Company (hereinafter referred to as "T.A.D.C."), as lessor. The lease covered the premises located at 48th Street and Troost Avenue (hereinafter referred to as "48th & Troost"), Kansas City, Missouri, on which Wil-Ray had conducted its auto auction since 1965. T.A.D.C. is a real estate investment and development company owned equally by J.C. Nichols Company, Inc., a Kansas City commercial realty company (hereinafter referred to as "J.C. Nichols"), and the Kemper family of Kansas City, Missouri. Miller Nichols, the chairman of the board of J.C. Nichols, was one of the original trustees of the University of Kansas City, now the University of Missouri (hereinafter referred to as "UMKC"). Based upon his interest in financially supporting *242 UMKC, Miller Nichols founded T.A.D.C. with the Kemper family. T.A.D.C. was founded for the purpose of obtaining real property in close proximity to UMKC, to be held for later transfer to UMKC. For the most part, T.A.D.C. acquired residential real property on the northern side of the UMKC campus that the UMKC trustees had designated as an area of interest for future expansion of UMKC. After acquiring property, T.A.D.C. would hold the property until such time that a transfer to UMKC could be effected, either by bargain sale or by gift. J.C. Nichols was employed by T.A.D.C. to manage the properties held by T.A.D.C. for later transfer to UMKC. In the course of managing the properties, J.C. Nichols rented the properties to third parties, generally faculty and students of UMKC until UMKC was in a position to accept a transfer of the properties. Since it was unknown when this might occur, J.C. Nichols generally rented the residential properties that T.A.D.C. owned on a month-to-month basis. During the late 1950s, T.A.D.C. acquired the property at 48th & Troost, which at one time was used as a storage and maintenance facility for trolley cars. The property was located on the northern *243 side of the UMKC campus, the area of interest encompassed by the long range growth plans of UMKC. This was the only non-residential property held by T.A.D.C. The 48th & Troost property was located in what is known as the "Troost Avenue Corridor," of Kansas City, Missouri. On this part of Troost Avenue there were located several new and used car dealerships of varying sizes. However, there was no other parcel of property available along Troost Avenue that would compare in size to the 48th & Troost property. The property at 48th & Troost consisted of an entire block of 4.86 acres. A car barn, originally used for trolley car maintenance but converted for use as the auction house, was located on the property. The car barn was a large building with two entrances at either end which permitted the ingress and egress of the automobiles being auctioned. Much of the property was accessible to and could be viewed by passing traffic, and prospective customers who drove by on auction day could view many of the cars parked on the lot. The property was improved for the auto auction business by the installation of lighting and fencing and a hard surface to minimize dust and mud in the parking *244 areas. These improvements were made by Wil-Ray sometime after Wil-Ray took possession of the premises in 1965. From 1965 to 1973, the leases between T.A.D.C. and Wil-Ray provided for a rental fee partly determined by the number of cars sold during each month and partly determined by a flat rate per month for the use of the car storage facility and parking space. The leases were generally for two-year terms but contained ninety-day termination provisions. Due to the short term of the leases and the presence of the termination provision, T.A.D.C. did not charge as high a rental fee for the use of the property as it would have charged if the leases were for longer periods and did not have a termination provision. Generally, car dealerships in the area had five year leases and no termination provisions. T.A.D.C. and Wil-Ray executed a new lease, dated February 8, 1973, which encompassed all of the property that Wil-Ray had previously rented and similarly had a term of two years. The rental fee, however, was set at a flat rate of $650 per month. The ninety-day termination provision was retained. In 1974, T.A.D.C. and UMKC had independent appraisals made of the property at 48th *245 & Troost for the purpose of determining a value at which UMKC might acquire the property by purchase from T.A.D.C. One appraiser determined the property to be worth $800,000, while the other set the value at $850,000. The appraisals were made only for the purpose of determining the sale value of the realty, not the rental value or the fair market value of the leases. In April of 1974, Willie White was approached by two individuals who were involved in the auto auction business in Chicago. The two individuals sought to purchase Wil-Ray from Willie White, but failed to do so because they were unable to renegotiate a longer lease. A lease with a ninety-day termination provision apparently was unacceptable. Later in 1974, Robert Gentle, Wil-Ray's operations manager and one of the shareholders of petitioner herein, began negotiations with Willie White for the purchase of Wil-Ray, but similarly found the lease provisions unacceptable. He also attempted to renegotiate Wil-Ray's lease with T.A.D.C. and at first was unsuccessful. He subsequently contacted officials of UMKC and was able to determine that UMKC would not be acquiring the property at 48th & Troost for at least a year from *246 the spring of 1974. With this information, he went back to T.A.D.C. and was able to renegotiate the lease on behalf of Wil-Ray. The new lease, dated June 17, 1974, was for a three year term commencing July 1. The rent in the first year was $750 per month, and then increased to $800 per month in the second year and $850 per month in the third year. The lease contained a provision allowing Wil-Ray to assign the lease to petitioner. Robert Gentle also was able to obtain a change in the ninety-day termination provision. The new provision provided for termination on six months' notice, but also provided that termination could not occur during the first six months. [2]
*247 In addition to the leasehold interest, petitioner acquired a customer card file in the liquidation. Petitioner had approximately 2300 customer cards in its file as of December 31, 1974, most of which were prepared by Wil-Ray. During the years 1965 through 1974, Wil-Ray had compiled an extensive customer card file, which contained information on car dealerships that had purchased cars at its previous auctions. Petitioner continued to maintain and use the cards obtained from Wil-Ray, and petitioner created cards on new customers. With respect to each customer, each card contained the company name and authorized representative, banking information, credit references and notations about the customer's prior sales and purchases at the auctions. Some of the information would be obtained from the customers when they applied to do business at the auction. The customers would complete a questionnaire, which then would be reviewed by one of the petitioner's office employees. The balance of the information, concerning credit and banking references, would be determined by telephone or letter. These references verified the customers' credit worthiness. Only upon completion of this investigation *248 would Wil-Ray or petitioner permit the customers' representatives to do business at the auction. This investigation could take over a week to complete. The cards in the file had to be updated continually because of changes in the information pertaining to the customers. For example, customers may change their authorized representatives or their banks. The credit information on all of the cards, therefore, was updated routinely twice a year to pick up any changes in the customers' credit rating. For purposes of this case, respondent and petitioner agree that it would cost petitioner approximately $10 per card to develop the information contained on each customer card. The customer card file had a number of uses. Although neither Wil-Ray nor petitioner were guarantors of the information contained thereon, buyers and sellers of automobiles relied on the auction company (namely Wil-Ray and petitioner) with respect to the following matters: validity of the title to the automobiles being auctioned; condition of the automobiles; and credit worthiness of the buyer when payment for the automobile was not made with cash. Buyers and sellers of automobiles depended on information Wil-Ray *249 and petitioner provided them from the customer cards with respect to the credit of the parties and with respect to the reliability of representations that were made concerning title and condition of the automobiles. The customer cards were also used to generate business for the auction. Wil-Ray and petitioner would send to those customers with respect to whom customer cards were maintained weekly market reports describing the prior week's auction results and informing the customers of special events scheduled in the following several weeks. Nevertheless, petitioner acknowledges that approximately one-third of the customers would return to Wil-Ray or petitioner to purchase automobiles regardless of the use of the customer cards. Individual customer cards would become obsolete over time because car dealerships went out of business, changed ownership, or customers changed auctions. As a result, the individual cards typically had an average life of five years to petitioner. Sparse information is found in the record with respect specifically to goodwill. Wil-Ray operated the auto auction and built up repeat customers from 1965 until 1974. During 1974 and 1975, there was only one *250 other auto auction in the Kansas City Metropolitan Area, the Kansas CityAuto Auction. Both auto auctions drew customers from approximately six or seven states, but did not conduct their respective auctions on the same days of the week in order to minimize competition. Notwithstanding the lack of information concerning goodwill, the parties have acknowledged that whatever cost is not allocated to the tangible assets, the leasehold interest and to the customer card file should be allocated to goodwill. OPINION Under section 334(b)(2), the $85,000 purchase price of the stock of Wil-Ray must be allocated to the various assets petitioner received in the liquidation of Wil-Ray. This allocation must be made to the specific assets in proportion to their respective fair market values. Section 1.334-1(c)(4)(viii), Income Tax Regs., provides that-- the amount of the adjusted basis of the stock * * * shall be allocated as basis among the various assets received * * * both tangible and intangible * * *. Ordinarily, such allocation shall be made in proportion to the net fair market values of such *251 assets on the date received * * *. The determination of the fair market value of property, including intangible assets, at a specific point in time is a question of fact "to be determined from all of the circumstances connected with the transaction * * *." Dellinger v. Commissioner,32 T.C. 1178, 1185 (1959). See also Rodman v. Commissioner,57 T.C. 113 (1971). With regard to the valuation of leasehold interests acquired as part of a going business, the fact that a lease has advantageous provisions to the lessee will not support a separate allocation to the leasehold interest unless a bonus or premium was paid to acquire that particular interest. Whether a premium is paid for the leasehold interest must be determined from the entire record in a particular case. Thomas v. Commissioner,31 T.C. 1009, 1012 (1959); Washington Package Store, Inc. v. Commissioner,T.C. Memo. 1964-294. Factors which are usually considered in determining the value of leasehold interests are: (1) the rental charged under the lease compared *252 to the fair market value rental for the property, KFOX, Inc. v. United States,206 Ct.Cl. 143, 510 F.2d 1365 (1975); C.G. Sloan & Co. v. Commissioner,38 T.C. 203 (1962); (2) the location of the property, Harris Amusement Co. v. Commissioner,15 B.T.A. 190 (1929), (3) the duration of the lease and any termination provision, Bryden v. Commissioner,T.C. Memo. 1959-184; Bates - Bowman Corp. v. Commissioner,16 B.T.A. 878 (1929); (4) the date of the most recent negotiations concerning the provisions of the lease, May v. Commissioner, a Memorandum Opinion of this Court dated July 22, 1944, and (5) the arm's length nature of the negotiations, Midler Court Realty, Inc. v. Commissioner,521 F.2d 767, 769 (3d Cir. 1975), affg. 61 T.C. 590 (1974). With respect to the valuation of customer lists, including intangible assets such as insurance expiration lists, patient medical files, and customer credit files, the courts have demonstrated some reluctance to make a separate allocation *253 to such assets because they are often inextricably linked to goodwill. [3]Ralph W. Fullerton Co. v. United States,550 F.2d 548 (9th Cir. 1977); Marsh & McLennan, Inc. v. Commissioner,420 F.2d 667 (3d Cir. 1969), affg. 51 T.C. 56 (1968); Richard S. Miller & Sons, Inc. v. United States,210 Ct.Cl. 431, 557 F.2d 446 (1976); Thoms v. Commissioner,50 T.C. 247 (1968); Boe v. Commissioner,35 T.C. 720 (1961), aff'd 307 F.2d 339 (9th Cir. 1962); Thrifticheck Service Corporation v. Commissioner,33 T.C. 1038 (1960), aff'd 287 F.2d 1 (2d Cir. 1961). In Manhattan Co. of Virginia, Inc. v. Commissioner,50 T.C. 78, 91 (1968), this Court, nevertheless, stated that if goodwill is -- acquired in connection with the acquisition of a customer list which otherwise has a limited useful life in the taxpayer's business, there is no reason why the purchase price should not be allocated between the . . . [two] asset[s] when the record contains sufficient facts to permit such an allocation. See also Los Angeles Central Animal Hospital, Inc. v. Commissioner,68 T.C. 269 (1977); *254 Johnson v. United States, an unreported decision, ( W.D. Tex. 1961, 7 AFTR 2d 793, 61-1 USTC par. 9278). With respect to goodwill, there is no uniformly accepted method for determining its value. Mossman, Yarnelle & Co. v. Commissioner,9 B.T.A. 45, 54 (1927). Courts have described goodwill as the expectancy that "old customers will resort to the old place." Houston Chronicle Publishing Co. v. United States,481 F.2d 1240, 1247 (5th Cir. 1973), cert. denied 414 U.S. 1129 (1974); Winn-Dixie Montogomery, Inc. v. United States,444 F.2d 677, 681 (5th Cir. 1971); Commissioner v. Seaboard Finance Co.,367 F.2d 646, 650 (9th Cir. 1966); *255 Los Angeles Central Animal Hospital, Inc. v. Commissioner,supra;Computing & Software, Inc. v. Commissioner,64 T.C. 223, 232 (1975). The determination of whether goodwill is present must be made by viewing the circumstances of the business as a whole. Mossman v. Commissioner,supra, at 54. Once a value, separate and distinct from goodwill, has been established for an intangible asset, an amortization allowance under section 167 may be permitted if the taxpayer uses the asset either in its trade or business or for the production of income and demonstrates that the asset has a limited useful life which can be determined with reasonable accuracy. Sec. 1.167(a)-3, Income Tax Rags. [4]; Houston Chronicle Publishing Co. v. United States,supra;Los Angeles Central Animal Hospital, Inc.,supra.
*256 As indicated previously, of the $83,000 basis remaining after allocating $2,000 to tangible property, petitioner allocated $50,000 to the leasehold interest, $23,000 to the customer card file and $10,000 to goodwill. Also, petitioner established a five year amortization schedule for the amounts allocated to the leasehold interest and the customer card file. Respondent allocated zero to the leasehold interest and to the customer card file and $83,000 to goodwill. Both parties agree that these are the only three assets among which the remaining $83,000 of the purchase price should be allocated. The issues for our determination, therefore, are what the respective fair market values are for those three assets and their eligibility for amortization deductions. As explained above, petitioner contends that the leasehold interest acquired in the distribution of the assets of Wil-Ray had a premium value of $50,000 which is to be amortized over a five-year useful life. Respondent argues that the leasehold interest had no premium value. The Court agrees with respondent's position. Petitioner's accountants arrived at the $50,000 figure in discussions with key employee-shareholders who *257 considered the rent paid under the lease to be a bargain for the auto auction premises. That fact along with the accountants' prior experience in representing car dealers was the basis for this determination. Petitioner explains its low rent for 4.86 acres of midtown Kansas City property by claiming that the charitable nature of T.A.D.C., its landlord, carried over into T.A.D.C.'s business dealings with petitioner. In support of this argument, petitioner cites the fact that T.A.D.C. failed to base the rental charge under the lease on the percentage-of-profits leasing concept developed by J.C. Nichols. There was considerable testimony concerning the location of the auction, its size, and the rent charged in comparison with other car dealerships in the same neighborhood. There were, however, no comparable properties or lease terms with which the provisions of petitioner's lease could be compared. Further testimony indicated that T.A.D.C. had set the rent for the property at 48th & Troost at the maximum it could get "under the circumstances." The primary circumstance limiting the amount of rent which could be charged was the termination provision, which was necessitated by the *258 underlying purpose for the ownership of the property by T.A.D.C. (namely, transfer of the property to UMKC at some indefinite time in the future for use as part of the university facilities). Car dealerships in the area generally had leases without termination provisions, and the termination provision of this lease was the subject of substantial arm's length negotiations. At the date of liquidation, December 31, 1974, the first six months of the lease had already expired; therefore, T.A.D.C. at any time could have given a termination notice to petitioner. With respect to the alleged charitable aspects of the rental rate, testimony by an employee of J.C. Nichols indicated that J.C. Nichols would not use the percentage leasing concept for this type of commercial property, namely auto auctions. The employee further stated that the charitable nature of T.A.D.C. did not carry over into its business dealings with petitioner. The Court finds that it was the short term of the lease combined with the termination clause that made the fair rental value of the property less than it otherwise would have been. It is therefore determined that there was no premium element associated with the *259 leasehold interest and that the rental charged under the lease was equal to the fair rental value. In light of this holding, it is unnecessary to consider whether the section 167 amortization requirements have been met with respect to the leasehold interest. Turning to the customer card file, petitioner's valuation of $23,000 is based on its estimate of a $10 cost for each of the 2,300 cards and on the evidence reflecting the extensive, daily use of the card file in all important aspects of petitioner's business. Respondent agrees with petitioner's cost estimates, but argues generally that the card file was inextricable linked to goodwill. The cards in petitioner's customer card file were clearly an important income producing factor in petitioner's business. They were used daily in obtaining information on customers, in providing information to customers, and in making decisions regarding customers, advertising and business promotions. The cards were updated on a regular basis by petitioner and its predecessor since 1965 for these purposes and so that the cards would be currently useful and valuable to the business. The customer cards involved in this case are not dissimilar *260 from those involved in Los Angeles Central Animal Hospital, Inc. v. Commissioner,supra; and Johnson v. United States,supra. In Los Angeles Central Animal Hospital, Inc. v. Commissioner,supra, the taxpayer acquired the assets of a veterinary hospital including certain medical record files. The files contained the names and addresses of the owners, as well as the medical histories of each patient. One-half of the intangible value of the files was determined to be separate and distinct from goodwill. Los Angeles Central Animal Hospital, Inc. v. Commissioner,68 T.C. at 275. The Court found: "The medical records * * * were clearly a major factor which would be relied upon by the purchaser for the production of income in the operation of the business. [Those] records [had] an ascertainable value separate and distinct from goodwill or going concern. The goodwill * * * encompassed the location of the hospital, the continued use of the [doctor's name] and the continued patronage of the hospital by pet owners within the area served. The medical records provided an added element. From those records, the operator *261 of the business [was] able to generate business by contacting the pet owners whose animals require[d] periodic immunization and inoculation. The "repeat business" which was obtained through the use of these records was not dependent solely on the normal elements of "goodwill." These specific records [did] not retain their value indefinitely as part of the continuing operation of the practice. [citation omitted]. [Those] records are further differentiated from goodwill in that their value to the petitioner [was] as a body of factual information to be used in the treatment of patients. As such, these records are similar to the credit records, which we held to be depreciable in Computing & Software, Inc., [supra]. In both cases, the records are valuable primarily as a resource for serving the clients of the business." Los Angeles,supra at 274. In Johnson v. United States,supra, the taxpayer acquired a specialized medical practice. Some of the assets acquired were medical record files, which contained patients' medical histories. In valuing the files, the district court determined that ten percent of the purchase price of the *262 files was attributable to goodwill and multiplied the number of files by their average individual value which was established at trial. The district court held that the balance of the purchase price of the files had a value separate and distinct from goodwill and noted that "[W]ithout the medical history the doctor would have to secure the information from the patient and use approximately $30.00 worth of time, for which he would not charge." 7 AFTR 2d at 795, 61-1 USTC at 79,675. Similarly here, the card file was a major factor in the production of petitioner's income and was separate from goodwill. Goodwill in this case encompasses primarily the location of the auto auction, not the information in the card file. The information in the card file enabled petitioner to generate business by contacting present customers and informing them of future auctions. Furthermore, such information enabled petitioner to have immediate access to the information it needed in order to run a successful auction. Respondent relies on cases involving insurance expiration lists. Those cases however are distinguishable from the facts present here. In Marsh & McLennan, Inc. v. Commissioner,supra, *263 we noted that competition in the insurance brokerage business was severe. Further in Thoms v. Commissioner,supra, at 256 we stated that-- It is difficult to see how any insurance agency could transfer its goodwill without delivering its insurance expiration list to the transferee. If the list is not given to the transferee of goodwill he receives no benefit in the form of a probability that the policyholders of the old business will renew with him, which is just another way of saying he did not get the goodwill. If the list is delivered to the transferee of goodwill it merely accomplishes the transfer of the goodwill -- defined to be the benefit that he will probably secure the renewals. The transfer of a list of expirations of a going insurance agency business is merely implementing the transfer of goodwill. It is furnishing the transferee with records that will give him the opportunity to succeed to the advantageous position of his transferor. In our opinion the list of expirations is an integral part of the goodwill of a going insurance agency business. [citations omitted]. In the present case however, the competition in the auto auction industry *264 in Kansas City was not severe. There were only two auto auctions during the years in issue with similar reputations. The auctions were conducted on different days purposefully. Petitioner and its competitor apparently felt there were sufficient customers for both businesses and therefore did not feel the need to compete for the same customers. Only one-third of the customers who came to petitioner's auction were steady customers. The balance would go to the other auction or might come back to petitioner but their reasons for doing so were not connected with any goodwill associated with the card file, but were attributable to the goodwill that resulted from the fact that there were only two auto auctions in the community. In a sense, petitioner, as the operator of the auction, was in the business of intermediating between the buyers and sellers of automobiles and was selling credit information, similar to the taxpayer in Computing & Software, Inc. v. Commissioner,64 T.C. 223 (1975). In that case, the taxpayer acquired credit files by purchase separately from other assets received in the acquisition of an ongoing business. In valuing the files, the Court determined *265 their value to be separate and distinct from goodwill because the credit information had value for only a limited period of time, unlike goodwill. The credit information which included the applicant's occupation, place of employment, bank connections, and credit references could be affected by various factors, which required the continual updating of the files. The credit files were found to be the primary productive asset of the business and not simply part of goodwill. Although in this case the files were not the primary productive asset of petitioner's business, the information that was on the customer cards was a significant productive asset of the business. We find that petitioner's customer card file had a value separate and distinct from goodwill. We find ourselves, however, in much the same situation as the Court in Computing & Software, Inc.,supra, at 235, wherein we stated as follows: "While the record does not contain a fully satisfactory formula for [the Court to make its own allocation among the assets in question]. . ., we think [a further] allocation is required." We cannot accept petitioner's allocation of $23,000 to the card file. Petitioner *266 stated at trial that one-third of its customers were repeat customers who would return to petitioner's auction regardless of the use of the customer cards. At least to that extent, it appears that the customer card file was so inextricably tied to goodwill that it cannot support a separate allocation thereto. For the reasons set forth above, we find that the customer card file had a value separate and distinct from goodwill in the amount of $15,000, or approximately two-thirds of the amount claimed by petitioner. In order to determine the period over which the $15,000 can be amortized, we must determine the useful life of the customer cards. Petitioner's evidence established that the cards had a useful life of approximately five years and we so hold. Petitioner's card file would become obsolete when dealerships were sold, went out of business or stopped dealing with petitioner. Respondent offered no specific evidence on this point. On this record, we agree with petitioner and find that the customer card file, valued at $15,000, is to be amortized over five years. The third and last asset to which we must make an allocation is goodwill. We adopt the parties' stipulation that *267 of the $83,000 in dispute, what is not properly allocable to the leasehold interest and to the card file will be allocated to goodwill. In light of our allocations of zero to the leasehold interest and $15,000 to the card file, the balance of $68,000 is allocated to goodwill. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
2. The provision reads as follows: LANDLORD'S CANCELLATION PRIVILEGE:
It is understood and agreed that landlord presently contemplates a major construction project on, or sale of, the land of which the herein leased premises are a part. Landlord, therefore, hereby reserves the right to cancel this lease upon giving six (6) months' notice in writing to tenant of its intent to so cancel. Said right to cancel, however, shall not be effective until after the first six (6) months of the term hereof, it being the intention of both parties that tenant have at least one full year of occupancy from the date of beginning of the term of the lease.↩
3. The law is settled that goodwill is not subject to an allowance for depreciation or amortization. See e.g., Winn-Dixie Montogomery, Inc. v. United States,444 F.2d 677 (5th Cir. 1971); Marsh & McLennan, Inc. v. Commissioner,420 F.2d 667 (3d Cir. 1969), affg. 51 T.C. 56↩ (1968).
4. Section 1.167(a)-3, Income Tax Regs. provides -- If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject to a depreciation allowance * * *. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill. * * *↩